**Joseph R. KAPP, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, an unincorporated association; et al., Defendants.**

**No. C-72-537 WTS.**

United States District Court, N. D. California.

Dec. 20, 1974.

74

Moses Lasky, Robert S. Daggett, John E. Munter, Brobeck, Phleger & Harrison, San Francisco, Cal., for plaintiff.

R. S. Cathcart, Bledsoe, Smith, Cathcart, Johnson & Rogers, San Francisco, Cal., and Covington & Burling, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

### THE RECORD

Plaintiff Joe Kapp, once an All-American (1958) for the University of California Bears, later a Professional quarterback of considerable renown in the Canadian League (1959–1966) and with the Minnesota Vikings (1967–1969) and finally a quarterback for the New England Patriots (1970), brings this suit against the defendants National Football League (NFL), its Commissioner Pete Rozelle and its 26 member professional football clubs and other related defendants, alleging antitrust conspiracy and monopoly among defendants, whereunder defendants in July, 1971, caused his discharge by the New England Patriots

with which he claims to have had an October 6, 1970 contract to play for the 1970, 1971 and 1972 seasons for a stated compensation of $600,000, alleging, further, that defendants, in effect, drove plaintiff out of professional football in the United States.

Plaintiff further alleges, as a breach of contract cause of action brought under the pendent and/or diversity jurisdiction of this federal court, that defendant Patriots breached its contract of October 6, 1970, and that the other defendants herein tortiously induced that breach of contract.

The case is now before the Court upon plaintiff's motion for a summary judgment declaring that, upon the evidentiary record now before the Court and as a matter of law, defendants have violated Sections 1 and 2 of the Sherman Act to plaintiff's injury in his person and property and, further, that defendant Patriots has breached its contract with plaintiff and, further, that all defendants herein wrongfully induced that breach.

The record before the Court, as presented by plaintiff, consists, in addition to the complaint and the answers, of certain depositions on file (of Rozelle, Kensil, Finks, Klosterman, Kapp, Cook, Ridder, Winter, Sullivan); an affidavit of Rozelle (2/17/73); admissions of defendants in response to plaintiff's requests and certain answers to interrogatories by defendants Vikings and Raiders. This record has been supplemented by defendants' affidavits of Sullivan, Kheel and Retzlaff.

### THE FACTS

The facts which appear from this record without dispute (except as may be otherwise expressly noted) are substantially as follows:

While Kapp was with the University of California and a prospective professional player, the Washington Redskins "drafted" him pursuant to a so-called "selection" or "draft" rule, embodied in the NFL Constitution and By-Laws, Sec-

tion 14.3(A) and 14.5, providing that at a Selection Meeting of the NFL Clubs, held annually in January or February, each club participating therein can select prospective players of its own choice; the selecting club will have the exclusive right to negotiate for the services of each player selected by it and placed on its Reserve List—even if the selecting club's offer to the prospective player might be unacceptable and even if the selecting club makes no offer at all, no other league club may negotiate with him without the consent of the selecting club.

The NFL Constitution and By-Laws, Section 9.2 also contains a so-called "tampering" rule which provides that if a member club shall tamper, negotiate with or make an offer to a player on the active, reserve or selection list of another club, then the offending club, in addition to being subject to all other penalties provided in the NFL Constitution and By-Laws, shall lose its selection choice in the next succeeding selection meeting in the same round in which the affected player was originally chosen and, if such offense was intentional the Commissioner shall have power to fine the offending club and may award the offended club 50% of the amount of the fine imposed by the Commissioner.

When the Washington Redskins made no satisfactory offer to Kapp, he went to the Canadian Football League and played there for seven years (1959–1966) during which period the Redskins kept him on their reserve list until April, 1966 and thus barred other NFL Clubs from negotiating with him.

Kapp's last Canadian contract expired after the 1966 season, subject to an option of his Canadian team to renew his contract for 1967—an option which was exercised. The Canadian Club, however, then suspended Kapp because of his covert negotiations, during December, 1966, with the Houston Oilers of the then American Football League.

Those negotiations had resulted in a contract between Kapp and the Oilers, dated February 10, 1967, whereunder Kapp was to be paid a $10,000 bonus to report to Houston in 1967 if his Canadian team did not exercise its option and, if it did, then he was to report to Houston in 1968 and play for two years at a salary of $100,000 a year.

On April 12, 1967, the Kapp-Oiler contract was declared invalid by NFL Commissioner Rozelle and by the then President of the AFL, acting together, according to plaintiff, pursuant to an understanding between the NFL and the Canadian League that players would not be permitted to contract during their contract periods for moving from one league to another.

Although Kapp still preferred to play for the Oilers, he eventually obtained clearance to play for the Minnesota Vikings when the latter paid Kapp's Canadian team $50,000 for his release and (apparently) made satisfactory arrangements with the Washington Redskins for any claim they might have. Kapp's contract with the Vikings, dated September 3, 1967, was for the 1967–1968 seasons with an option to have him also in 1969 for a total compensation of $300,000.

Kapp played with the Vikings during 1967 and 1968; the Vikings then exercised their option for a third year, 1969, during which Kapp contributed considerably to the Vikings' NFL championship and participation at the Super Bowl.

The Vikings offered Kapp a contract for another two years upon the same compensation terms but Kapp declined to sign. Other clubs, needing a quarterback of Kapp's ability, expressed interest—the Philadelphia Eagles and the Houston Oilers—but neither club followed up with an offer.

According to plaintiff, this was because those teams were restrained by the so-called "Ransom" or "Rozelle" rule which, as embodied in the NFL Constitution and By-Laws (Sec. 12.1(H)), provides that no league club will employ a player even if he has become a free agent by playing out his contract (as did Kapp) unless the new employing

club either makes satisfactory arrangements with the former employing club, or, absent such satisfactory arrangements, employs the player subject to the power of the NFL Commissioner to name and award one or more players to the former club from the active reserve or selection list of the acquiring club as the Commissioner in his sole discretion deems fair and reasonable.

Eventually, the New England Patriots, needing a quarterback of Kapp's abilities, sought assurances from the Minnesota Vikings concerning what they would require as a ransom in the event the Patriots employed Kapp. This resulted in a transfer agreement between the Vikings and the Patriots under which the Patriots surrendered to the Vikings the Patriots' first round of draft choice for 1972 and, in addition, their number-one draft selection of 1967.

Under these conditions the Patriots contracted with Kapp under date of October 6, 1970, for his services as a Patriot for the remainder of the 1970 season and for 1971 and 1972 at a total compensation of $600,000. (Defendants contend that there is some evidence in the record that this claimed contract was merely a memorandum intended by the parties to be effective only when Kapp signed a Standard Player Contract).

Nevertheless, Kapp played for the Patriots under that agreement for the remaining eleven games of the 1970 season and was paid $154,000 of the contracted amount.

In January, 1971, the Patriots, acting pursuant to the NFL Constitution and By-Laws and at the direction of the Commissioner, sent Kapp a form of Standard Player Contract but Kapp refused to sign it. This Standard Player Contract is required by the NFL Constitution and By-Laws, Sections 15.1 and 15.4, to the effect that all contracts between the clubs and players shall be in the form adopted by the member clubs of the league, each club to have the right to modify such standard contract but subject to the right of the Commissioner to disapprove any such modification which is in violation of the Constitution and By-Laws or if either contracting party is guilty of conduct detrimental to the league or to professional football.

The Standard Player Contract (Pars. 4, 6 and 11), so required, provides that the player becomes bound by the Constitution, By-Laws, Rules and Regulations of the league and of his club, including future amendments thereto and to the discipline of the club—subject only to the right to a hearing by the Commissioner whose decisions shall be final and unappealable.

The Standard Player Contract, Par. 10 also contains the so-called "option" rule which gives the employing club an unilateral option to renew the contract for a further term of one year at a reduced rate of compensation, i. e., 90% of the amount paid by the player in the previous year—the purpose of this rule being, according to plaintiff, to coerce the player to sign a new contract on the owner's terms under peril of having to serve another year at the reduced compensation.

On May 28, 1971, Commissioner Rozelle wrote to the Patriots reminding the club that Articles 17.5(B) and 15.6 of the NFL Constitution and By-Laws provide that no player may play in a game or practice with a member club unless an executed Standard Player Contract is on file with the Commissioner.

Kapp was permitted to report to the Patriots (1971) training camp and to take the physical examination and participate in team meetings and light workouts but, when he persisted in his refusal to sign the Standard Player Contract he was, in effect, told by the Patriots to leave.

In July, 1971, the defendant clubs instituted a grievance procedure against Kapp, pursuant to the NFL Constitution and By-Laws §§ 8.3, 8.5 and 8.13(F), complaining that he had refused to sign a Standard Player Contract and, upon

reference of the grievance to Commissioner Rozelle for decision, the Commissioner, (Kapp failing to appear) reaffirmed his previous decision by ordering Kapp to sign a Standard Player Contract as a condition of eligibility to continue his participation in football activity on behalf of the Patriots or any other NFL Club.

The NFL Constitution and By-Laws (Art. VIII, §§ 8.3, 8.5 and 8.13(A)(F)), under which these grievance proceedings were conducted, provide in substance that the Commissioner shall interpret the Constitution and By-Laws (8.5), shall have full, complete, and final jurisdiction of disputes between member clubs, disputes between players and disputes involving member clubs and players (8.3(e)); also to disapprove without a hearing, contracts between a player and a club executed in violation of or contrary to the NFL Constitution and By-Laws or detrimental to the league or the sport. (8.13(F)).

These powers of the Commissioner are acknowledged by any player who signs the Standard Player Contract. (See Section 11 thereof).

Even after Kapp's departure from the Patriots' training camp the Patriots retained him on their reserve list in the expectation that, under the so-called "Ransom" or "Rozelle" Rule, already above mentioned, the Patriots could claim a ransom if Kapp should sign with any other NFL Club.

Further facts shown by the record, bearing on the collective bargaining issue, will be separately hereinafter set forth when discussing that issue.

PLAINTIFF'S CONTENTIONS

Plaintiff contends that the foregoing rules contained in the NFL Constitution and By-Laws, i. e., the so-called "Draft" rule (NFL Constitution and By-Laws Sec. 14.3 and 14.5), the so-called "Tampering" rule (NFL Constitution and By-Laws Section 9.2), the so-called "Op-

tion" Rule (Standard Player Contract, Par. 10), the so-called "Rozelle" or "Ransom" Rule (NFL Constitution and By-Laws Sec. 12.1(H)), the "Standard Player Contract" Rule (NFL Constitution and By-Laws, Sec. 15.1–15.4); and the rules vesting the power to make final interpretations and decisions in the Commissioner (Const. & By-Laws [Art. III, Sec. 8.3, 8.3(e), 8.5, 8.13(A), 8.-13(F)]) constitute a combination among defendants to refuse to deal with players except under the above stated conditions —in effect a boycott or blacklist—and as such a per se violation of the Sherman Act.

Plaintiffs further contend that, apart from the *per se* rule, the combination is illegal even under the "rule of reason" because the restraint obviously goes far beyond what would be reasonably necessary to achieve the business goals involved, citing such cases as International Salt v. United States, 332 U.S. 392, 397–398, 68 S.Ct. 12, 92 L.Ed. 20 (1947); International Bus. Mach. v. United States, 298 U.S. 131, 139–140, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); White Motor Co. v. United States, 372 U.S. 253, 271–272, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); and, in the field of league sports, Denver Rockets v. All-Pro Mgt., 325 F.Supp. 1049, 1066 (C.D.Cal.1971).[1]

DEFENDANTS' CONTENTIONS

Defendants contend (1) that the rules contained in the NFL Constitution and By-Laws and in the Standard Player Contract, do not amount to a violation of the antitrust laws—certainly not to such a refusal to deal as would amount to a *per se* violation of Section 1 of the Sherman Act as contended by plaintiff, and (2) that, even if these rules might otherwise amount to an antitrust violation, all of these rules are now immunized from antitrust laws by having become since at least from February 1, 1970, the subject of, and the result of, collective bargaining between the NFL, as an em-

---

1. Plaintiff, as already noted, also asserts a breach of contract cause of action against defendants—a subject which will be separately considered later in this memorandum.

ployer, and the NFL Football Players' Association as the certified collective bargaining labor union representative of all NFL players.

Deferring consideration of defendants' asserted collective bargaining defense, we take up first the question whether the rules contained in the NFL Constitution, By-Laws and Standard Player Contract, amount to a violation of the Sherman Act *per se* or otherwise.

## THE ANTITRUST ISSUE—CONTENTIONS OF THE PARTIES

In support of his contention that defendants' rules amount to a per se violation of the antitrust laws, plaintiff cites and relies upon cases which we set forth in our Notes 2 and 3.[2]

■ Defendant, recognizing that Radovich v. NFL, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) has settled the matter, concedes that professional football league activity, unlike similar baseball activity, is subject to the antitrust laws.[3]

Defendant contends, however, that the rules here in question do not amount to an antitrust violation—certainly that they do not amount to a per se Section 1 violation, because, in any event, the antitrust legality of the questioned rules and activities would have to be tested by the "rule of reason."

In support of this contention, defendants argue that professional league sport activities, such as football, must be dis-

tinguished from other kinds of business activities which have been held to be per se antitrust violations; that league sports activities are so unique that the per se rule is inapplicable; that, although club teams compete on the playing field, the clubs are not, and indeed cannot be, competitors with one another in a business way because the very purpose of a professional sports league is to provide reasonably matched teams for field competition to attract and sustain the interest and patronage of the fans; that the success of the league as a joint venture of its clubs depends upon the ability of each club to do this; that, if each member club were allowed by the league to engage in free-for-all competition for the best or better players, then the most strongly financed or otherwise better advantaged clubs would be able to sign up and monopolize the best or better players, leaving only average or mediocre players for the other clubs with the effect of destroying the evenly matched field competition that brings fans to the games.

For this reason, defendants say, there must be league agreements and rules which, restricting the freedom of the clubs to compete for players, impinge to some extent upon the freedom of players to choose their own clubs.

In support of their position defendants point out that the uniqueness of sports league activity in these respects has been long and widely recognized in the Congress,[4] in the Department of

2. For Notes 2 and 3 see Appendix.

3. This strange antitrust law distinction between professional baseball league and similar football activities originated in Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), which was followed by the Supreme Court in Toolson v. N. Y. Yankees, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953) and adhered to in Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1971)—all holding baseball to be exempt.

4. As to the Congress, defendants refer to the 1961 enactment of 15 U.S.C. §§ 1291–1294 exempting joint arrangements for club tele-

vision rights from the antitrust laws; the 1964 reporting out by a Senate Committee of a bill exempting professional league sports in all its phases from antitrust; the 1958 sponsorship by then Senator John F. Kennedy of a bill that would have provided a substantially unqualified antitrust exemption for the player rules of all professional sports leagues, the Senator stating that these leagues are so unique that they cannot be treated in the same manner as other businesses; the 1966 enactment of 15 U.S.C. § 1291, authorizing merger of the American Football League with the National Football League.

Justice,[5] and, indeed, by the football players, themselves, speaking through their Players' Association to the effect that each member club in the NFL has a direct economic stake in the successful operation of every other member club and that the players, therefore, support certain structural ingredients of the business—such as the draft and option clauses. (See our Note 6.) [6]

## THE ANTITRUST ISSUE—CONCLUSIONS

■ At the outset we note that, since the complaint and the record herein show without dispute that the claimed antitrust practices of the defendants are by their very nature directed at the players, including plaintiff, he has standing to sue under the Clayton Act Section 4 (15 U.S.C. § 15). (See Ostrofe v. H. S. Crocker Company, this court's No. 74 0090—WTS, decided 12/4/74, reviewing cases, including Radovich v. NFL, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), on standing of employees to sue).

In *Radovich* the Supreme Court, reversing the District Court on the ground that professional football, unlike professional baseball, *is* subject to the antitrust laws, went on to examine the complaint which alleged, as in our case, a similar combination to in effect boycott any player violating rules designed to restrict the players signing with another club without the consent of the club holding his contract. The Supreme Court expressly recognized the complaint's sufficiency to give the plaintiff standing to proceed with his case under the federal antitrust laws (See pp. 453–454, 77 S.Ct. 390).

The record herein shows without dispute the involvement of interstate commerce. (See Lawrence Flood v. S. F. Forty-Niners, this court's No. C–72–1704 WTS, 7/9/74, citing Radovich v. NFL. supra, also on this point; also United States v. Int. Boxing Club, 348 U.S. 236, 241, 75 S.Ct. 259, 99 L.Ed. 290 (1955)).

We also note that there is no genuine issue as to any material fact bearing on the existence and nature of the challenged rules; they are all set forth in admitted agreements embodied in the NFL Constitution, By-Laws and Standard Player Contract.

However, since plaintiff contends that the challenged rules are illegal *per se,* while defendant argues for the test of *reasonableness,* we must now determine which test to apply in this case.

There is authority to the effect that combinations of the kind shown by the record here, constitute *per se* antitrust violations (See our notes 2 and 3, Appendix).

Under the holdings of those cases the combination here shown would be a per se violation of the antitrust laws.[7] In Washington State Bowling Assn. v. Pacific Lanes (Ninth Circuit) supra, (Note 3, Appendix) the Court applied the principle that in league sports activities all jointly enforced regulations, limiting the right of each club to deal with anyone it chooses and consequently limiting to some extent the players' free choice of employment, are *per se* illegal—regardless of whether the

---

5. As to the Department of Justice, defendants refer to a 1961 acknowledgment by the Department that professional league teams must have some joint agreements to assure continued functioning of leagues, that Congress has so indicated and that, therefore, investigation of NFL player transfer rules was unwarranted; also the 1971 similar acknowledgment that some activities, especially league sports, cannot exist without restraint of this kind.

6. For Note 6, see Appendix.

7. For example, a league enforced "draft" rule—Denver Rockets v. Mgt. Assn., supra, Note 2 in Appendix; (also Anderson v. Shipowners Assn., supra, Note 2, Appendix); a league enforced option rule—Boston v. Cheevers, supra, Note 3, Appendix; a league enforced reserve clause in a Standard Player Contract—Gardella v. Chandler, supra, Note 3, Appendix; a league sole discretionary suspension rule—Blalock v. Ladies Golf Assn., supra, Note 3, Appendix.

regulation is designed to promote the league sport rather than to constitute a boycott.

However, we are of the opinion that for reasons to be hereinafter set forth it is not necessary to rest our decision in this pending case on an application of the *per se* rule.

In the first place, there are cases which, recognizing the unique nature and purpose of sports league activities, hold (for reasons set forth in our Note 8,[8] and supra at pp. 79–80), that the *per se* rule is inappropriate and inapplicable to sports league activities. (See, mainly, Flood v. Kuhn, 316 F.Supp. 271, 273–276 (S.D.N.Y.1970); see also *id.* 309 F. Supp. 793, 801 (S.D.N.H.1970) and Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (E. D.Pa.1972).

The history of federal Executive (See our Note 5, supra), and Congressional (See our Note 4, supra), interpretation of the antitrust laws, as they relate to sports league activities, seems to accord with the reasoning of the cases last above referenced.

It may also be noted that suits brought by player-employees against sports league club-employers, are different from the more typical antitrust suits, brought by persons or firms claiming to have been injured in their business or property as a result of defendants' anti-competitive practices, e. g., cases in which it has been held that agreements among competitors to fix prices, allocate territories, rig bids and, ordinarily, agreements to refuse to deal, constitute *per se* antitrust violations.

In our pending case and in similar cases the only alleged anti-competitive practice is joint club enforcement, through the league, of player-employee contracts whereunder the player agrees to accept and the clubs agree among themselves to enforce certain restrictions on the players' right to freely pursue his trade with other club-employers

and the clubs yield to that extent their free choice to employ.

■ There is a well-settled rule of contract law that employer-employee contracts, restricting an employee's right to freely pursue his trade, may be illegal as against public policy *if, but only if,* the restraint is *unreasonable,* taking into consideration the nature of the business, the duration of the restraint, the area in which it operates, the situation of the parties and all circumstances bearing on whether the restriction is such only as to afford fair protection to the interests of the employer without imposing such an undue hardship on the employee as to interfere with the *public interest.* (See 17 C.J.S. Contracts (illegality of) §§ 238–258).

■ We have in mind, of course, that when two or more club employers agree through league rules that individual player-employees, who violate such individual club-employee contracts will be in effect boycotted by *all* member club-employers, the situation goes beyond mere employer-employee contracting and falls within the antitrust law *per se* prohibition of *combinations* not to deal—even though the reasonableness test would have been applicable to the individual player contract.

It is arguable, however, that in this unique field of sports league activities (wherein to achieve fairly evenly matched teams on the field, there must be some degree and kind of restriction on the right of clubs to hire and players to sign as they please) the test of legality of league rules for that purpose should be the same test, i. e., reasonableness test, as would be applicable to the individual player-club contract.

A further argument for preferring the reasonableness test is the existence of the player-employee/club-employer relationship—a relationship which lends itself to collective bargaining. Application of the absolute antitrust *per se* rule to *all* league rules enforcing restrictions

8. For Note 8, see Appendix.

upon the players' free choice of employment tends to preclude collective bargaining negotiations for league enforcement of some rules in this category which, considering the unique nature and purpose of league sports, may be regarded by both players and clubs as reasonably necessary in furtherance of their long-range *mutual* interests.

■ For the foregoing reasons we conclude that in this particular field of sports league activities the purposes of the antitrust laws can be just as well served (if not better served) by the basic antitrust reasonableness test as by the absolute *per se* test sometimes applied by the courts in other fields.

■ In applying the reasonableness test we have in mind that the issue of reasonableness is ordinarily in such genuine dispute that a case cannot be resolved on a motion for summary judgment and must go to full trial of that issue.

However, in the present case, league enforcement of most of the challenged rules is so patently unreasonable that there is no genuine issue for trial.

■ The "Ransom" or "Rozelle" rule, provides in effect that a player, even after he has played out his contract under the option rule and has thereby become a free agent, is still restrained from pursuing his business to the extent that all league members with whom he might otherwise negotiate for new employment are prohibited from employing him unless upon consent of his former employer or, absent such consent, subject to the power of the NFL Commissioner to name and award one or more players to the former employer from the active reserve or selection list of the acquiring club—as the NFL Commissioner in his sole discretion deems fair and reasonable.

A conceivable effect of this rule would be to *perpetually* restrain a player from pursuing his occupation among the clubs of a league that holds a virtual monopoly of professional football employment in the United States.

We conclude that such a rule imposing restraint virtually unlimited in time and extent, goes far beyond any possible need for fair protection of the interests of the club-employers or the purposes of the NFL and that it imposes upon the player-employees such undue hardship as to be an unreasonable restraint and such a rule is not susceptible of different inferences concerning its reasonableness; it is unreasonable under any legal test and there is no genuine issue about it to require or justify trial.

Similarly, the draft rule (Sec. 14.-3(A), 14.5) is also patently unreasonable insofar as it permits virtually *perpetual* boycott of a draft prospect even when the drafting club refuses or fails within a reasonable time to reach a contract with the player.

Similarly, the so-called "one-man rule" (Const. & By-Laws, Art. VIII, Sec. 8.3, 8.3(e), 8.5, 8.13(A), vesting final decision in the NFL Commissioner, is also patently unreasonable (particularly where considered in the light of principles of *impartial* arbitration embodied in the Federal Arbitration Act, 9 U.S.C. § 1–14, and underlying the decision of the Supreme Court in Commonwealth Corp. v. Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)), insofar as that unilateral kind of arbitration is used to interpret or enforce other NFL rules involving restrictions on the rights of players or clubs to free employment choice.

Similarly, the tampering rule (Const. & By-Laws, Sec. 9.2) and the Standard Player Contract rule (Const. & By-Laws, Secs. 15.1 and 15.4) are also patently unreasonable insofar as they are used to enforce other NFL rules in that area.

■ The Option Rule, which appears only in the Standard Contract (Par. 10), gives the club an option for one additional year of service at 90% of the contract salary unless otherwise agreed. Since NFL rules leave the matters of duration and salary to free negotiation between players and clubs, this lone prescribed option provision cannot be said

to so extend the original term and salary as to render it patently unreasonable; its legality cannot, therefore, be determined on summary judgment.

However, it is not necessary to hold that NFL league enforcement is illegal as to *all* restrictive employment or tenure rules; it is sufficient if we can determine on summary judgment the illegality of league enforcement of one or more such rules to the detriment of plaintiff.

It remains, therefore, only to determine whether NFL enforcement of the rules which we have held to be patently unreasonable and illegal can be deemed to have been the cause or at least one of the causes of injury to plaintiff.

We have in mind that the record here shows that the immediate cause of plaintiff's discharge by the New England Patriots was his refusal to comply with demands that he sign the Standard Player Contract.

However, as already explained, signing of the Standard Player Contract (including its paragraphs 4, 5 and 6) would bind a player to the whole NFL Constitution and By-Laws which, in turn, include the rules herein held to be illegal.

As already indicated, we are mindful that it may be held on review that application of the *per se* test renders NFL enforcement illegal as to *all* restrictive employment or tenure rules regardless of reasonableness for sports league purposes. If so, such holding could be made on the present record without trial or further proceedings.

## THE COLLECTIVE BARGAINING IS-SUE—CONTENTIONS OF THE PARTIES

The facts on this issue, as shown by the record, are substantially as follows:

As early as 1956 the NFL players formed a Players' Association and, although the Association was not then certificated by the NLRB, it did negotiate with the clubs through the NFL on many matters of interest and value to the players.

In 1968, the Players' Association received official recognition from the NLRB as a labor organization, i.e., a union within the meaning of NLRA, 29 U.S.C. Sec. 152(5), and as such the exclusive bargaining representative of all NFL players within the meaning of the NLRA, 29 U.S.C. § 159(a). The Players' Association has ever since negotiated with the NFL in the exercise of its power and mandatory duty, as such a representative, to bargain with the club-employers through the NFL, concerning wages, hours and other terms and conditions of employment.

As the result of that collective bargaining, two formal collective bargaining contracts have been executed—one in 1968 between the Association and the then 16 club NFL for the two-year term 1968–1970 and the second, dated June 17, 1971 (but by its terms made retroactive to February 1, 1970—the date of expiration of the previous contract) with the 26 members of the expanded NFL for the term February 1, 1970 through January 30, 1974.

This 1970–1974 Collective Bargaining Contract contained for the first time a provision (Art. III, § 1 of the 1970 contract) to the effect that "All players in the NFL shall sign the Standard Player Contract which shall be known as the 'NFL Standard Player Contract'" and that "The Standard Player Contract shall govern the relationship between the clubs and the players, except that this agreement shall govern if any terms of the Standard Player Contract conflict with the terms of this agreement. No amendments to the Standard Player Contract affecting the terms and conditions of employment of NFL players shall be effected without the approval of the NFLPA, subject, however, to the right of the player and his club to agree upon changes in his contract consistent with this agreement."

As already noted, the Standard Player Contract contains the option rule (Par. 10) and also provides (Pars. 4, 6 and 11) that the player becomes bound by

the Constitution, By-Laws, Rules and Regulations of the NFL and of his club, including future amendments thereto, and to the discipline of the club—subject only to the right to a hearing by the Commissioner whose decisions shall be final and unappealable.

Thus, the June 17, 1970 Collective Bargaining Contract provision (Art. III Sec. 1) requiring players to sign the Standard Player Contract, in effect binds the players who sign the Standard Player Contract to *all* the rules challenged by plaintiff in this case.

Since February 1, 1974, the expiration date of the 1970–74 Collective Bargaining Contract, the Players' Association and the NFL have been unable to agree on a new contract. Negotiations were commenced in early 1974; on July 1st the Association called a strike against the NFL as a means of enforcing their demands which included, in addition to the usual issues of wages, hours and working conditions, certain so-called "freedom issues." The strike lasted until August 19th when the Association announced a cooling period and allowed its members to report to their respective training camps, reserving, however, the right to call another strike unless agreement is reached on a new contract.

Defendants contend that all the rules here challenged by plaintiff have been the result of the collective bargaining embodied in the 1970–1974 Collective Bargaining Agreement between the NFL and the Players' Association (of which plaintiff was a member), as exclusive bargaining agent for all NFL players; that since a labor union, duly certified by the NLRB as exclusive bargaining agents for employees, has authority to bind employees, the provisions of that Collective Bargaining Contract cannot be challenged by plaintiff, an employee thus bound, citing NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), holding that employees are bound by the agreements made by their collective bargaining agents even though individual employees may feel such agreements adversely affect them; that Art. III, Section 1 of the 1970–1974 Collective Bargaining Contract requires players to sign the Standard Player Contract, which in turn binds them to the option rule (contained in Par. 10) and (Pars. 4, 5, 6) to all the other rules contained in the NFL Constitution, By-Laws and Regulations.

Defendants contend that, since all of the rules have been in this manner accepted by the players, through their association, as a result of collective bargaining, the rules are exempt from the antitrust laws even if otherwise they would be in violation thereof, citing and relying on the cases which we briefly describe in our Note 9.[9]

Plaintiff, responding to defendants' asserted collective bargaining defense, contends (1) that these collective bargaining agreements, especially the contract of June 17, 1971, containing the requirement that players sign the Standard Players Contract insofar as they contain, expressly or by reference, the various agreements and rules herein challenged, are not exempt from the antitrust laws by the collective bargaining process, citing and relying on such cases as are cited and briefly discussed in our Note 10;[10] (2) that in any event the collective bargaining agreement, dated June 17, 1971, which by its terms was made retroactive to February 1, 1970, could not retroactively affect the plaintiff's contract with the New England Patriots which, as already noted, was dated October 6, 1970, eight months before execution of the June 17th collective bargaining contract, citing Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, 351 F.Supp. 462 (E.D.Pa. 1972); Goodin v. Clinchfield Ry. Co., 125 F.Supp. 441 (E.D.Tenn.1954).

On this latter point defendants reply that the 1970–1974 collective bargaining contract, although dated June 17, 1971,

9. For Note 9, see Appendix.

10. For Note 10, see Appendix.

was merely a formalization of an interim agreement reached by the Association and the NFL on August 3, 1970 (also made retroactive to February 1, 1970) but not finally formalized until June 17, 1971.

(3) Plaintiff also contends that the Collective Bargaining Agreement provision, Art. III, Section 1, insofar as it purports to bind players to NFL rules calling for unappealable decision of the Commissioner (e.g., NFL Constitution, By-Laws, Art. III, Secs. 8.3, 8.3(e), 8.5, 8.13(A)(1), 8.13(F)) must be held inoperative because (1) antitrust violations are not subject to arbitration, and (2) such arbitration by the NFL Commissioner would be a denial to the players of due process.

## COLLECTIVE BARGAINING ISSUE —CONCLUSIONS

The problem of the extent to which collective bargaining may immunize union-employer agreements in professional sports league activities from the antitrust laws has been recognized by the Supreme Court only to the extent that Marshall, J., dissenting in Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L. Ed.2d 728 (1971) from the majority holding that baseball is exempt from antitrust, went on to observe, at pages 293–296, 92 S.Ct. 2099, that even if baseball was subject to antitrust there would still remain the issue of the effect of collective bargaining. He pointed out that, although the court had decided cases involving union management agreements working to the detriment of management's competitors, the court had not dealt with a situation in which the collective bargaining agreement is claimed to work to the detriment of labor—as in our pending case; he raised the question whether there would be exemption from the antitrust laws if it were shown that collective bargaining acceptance of the reserve system had been "thrust upon," rather than freely accepted by, the players' union; also

raised was the question as to "the limits to the antitrust violations to which labor and management can agree."

The earlier cases cited by Justice Marshall in Flood v. Kuhn, supra, are included in our Note 10 (Appendix).

It may be noted, however, that in Radovich v. NFL, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court rejected, without squarely facing the issue, a claim that federal labor statutes governed the relationship between a professional athlete and professional sport.

■ Whatever may be the immunizing effect of collective bargaining upon otherwise illegal restraints of trade in league sports (See 81 Yale Law Journal 1 (1971–72)), it is not necessary to rest the decision of the pending case upon any such point of law because in this case the record shows that there was no such collective bargaining contract.

Defendants rely on the Collective Bargaining Contract, dated June 17, 1971 (but by its terms made retroactive to February 1, 1970) for their contention. that the NFL Constitution and By-Laws, Secs. 15.1 and 15.4, requiring players to sign the Standard Player Contract (with all that implies), had been in effect accepted by plaintiff, through the Players' Association and incorporated into that Collective Bargaining Contract (Par. 10) after and as the result of collective bargaining. (See our Note 11.)[11]

The record shows, however, that it was between January and May 28, 1971 that defendants, acting through the NFL Commissioner, brought their pressure to bear on plaintiff to sign a Standard Player Contract as a condition of remaining with the Patriots. It was on May 28th that the Commissioner wrote the Patriots to the effect that no player could play in a game or even practice with a member club unless an executed Standard Contract was on file with the Commissioner. The Collective

11. For Note 11, see Appendix.

Bargaining Contract of June 17th containing for the first time such a requirement, had not then been executed.

The Patriots allowed Kapp to remain at training camp after May 28th only with the expectation that he would comply with the condition. When he failed to do so, the Patriots, pursuant to NFL pressure, told him to leave and he did eventually leave on July 15, 1971.

Further, according to the record, no claim was ever communicated by the NFL to plaintiff during the January–May 1971 period that the requirement for signing a Standard Player Contract was based on the existence of any collective bargaining agreement—only that such was required by the NFL Constitution and By-Laws. Yet, it was the pressure exerted during that period by the NFL upon the Patriots and in turn by the Patriots upon plaintiff that led to his discharge by the Patriots and to the eventual formality of grievance procedures brought by NFL against him in absentia, in July, 1971. Defendants may not now assert that the Collective Bargaining Contract of June 17, 1971, retroactively justifies their earlier ouster of plaintiff.

■ Further, even if the NFL Standard Player Contract requirement had been accepted through collective bargaining, there would still remain the question, well put by Marshall, J. in *Flood, supra,* as to what are "the limits to the antitrust violations to which labor and management can agree." We are of the opinion that, however broad may be the exemption from antitrust laws of collective bargaining agreements dealing with wages, hours and other conditions of employment, that exemption does not and should not go so far as to permit immunized combinations to enforce employer-employee agreements which, being unreasonable restrictions on an employee's right to freely seek and choose his employment, have been held illegal on grounds of *public policy* long before and entirely apart from the antitrust laws.

We conclude, therefore, that upon the record before us it appears with no genuine dispute as to any material fact that the NFL Standard Contract Rule (NFL Const. & By-Laws, Sec. 15.1 and 15.4) under which plaintiff was discharged from his employment, had not been contractually accepted by plaintiff or the Players' Association as the result of collective bargaining.

It is unnecessary to decide the further question whether collective bargaining contracts, insofar as they bind members of a union to employer enforcement of individual contract restrictions upon the employee's right to pursue his trade with other employers, really fall within the NLRA requirement for collective bargaining concerning "wages, hours and other terms and conditions of employment."

Further, it becomes unnecessary to decide the issue whether the claimed Collective Bargaining Contract of June 17, 1971, even if otherwise applicable, was the result of genuine collective bargaining or was (to use the words of Marshall, J. in *Flood,* supra) "thrust upon" the players and their Association by the league—as was the claimed collective bargaining contract in Philadelphia World Hockey Club v. Philadelphia Hockey Club (See our Note 10).

## THE BREACH OF CONTRACT ISSUE

Nor is it necessary to rule at this time upon plaintiff's pendent breach of contract count against defendant Patriots, including charges of tortious inducement of such breach by all defendants—a count which may involve some genuine issues of material fact and, therefore, requiring trial—along with the issue of damages consequent upon any breach of contract.

## ORDER

For the above reasons, the plaintiff's motion for summary judgment should be and hereby is granted in part in accordance with the views set forth herein.

Plaintiff shall forthwith prepare, pursuant to Local Rule 123, a proposed form of judgment consistent with the views herein expressed.

APPENDIX

Note 2

In support of his per se violation contention plaintiff cites and relies on Anderson v. Shipowners Assn. of the Pacific Coast, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926)—an agreement among shipowners through their Association to control the employment of seamen, i. e., that no seaman could obtain employment without registering with the Association, receiving a number and awaiting his turn to accept a job as offered or none at all; Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930), an agreement among film distributors to do business with exhibitors only through a Standard Exhibition Contract governing license terms, scheduling and submission of all controversies to a board of arbitration; Fashion Originators' Guild of America, Inc. v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941)—an agreement among members of a style designers guild not to sell their creations to "style pirates;" Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)—an agreement among retail stores not to deal with certain traders; United States v. Hilton Hotels Corporation, 467 F.2d 1000 (9th Cir. 1972)—an agreement among hotels to give preferential treatment to suppliers who paid dues to an association formed by the hotels to attract conventions to their city—held a per se violation of the antitrust laws.

Note 2(a)

As instances of specific application of this per se rule to sports league activities plaintiff cites: Washington State Bowling Prop. Assn. v. Pacific Lanes, Inc., 356 F.2d 371 (9th Cir. 1966) an agreement among defendants conducting bowling tournaments, to restrict their league and tournament bowling to members of certain associations; Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971)—an action by a basketball player to enjoin the National Basketball Association from enforcing by-laws prohibiting players from negotiating with any league within a fixed period, held that the clause constituted a group boycott in violation of the antitrust laws and, as such, was illegal per se; Boston Professional Hockey Assn. Inc., v. Cheevers, 348 F.Supp. 261 (D.C.Mass.1972)—a one-year option rule held a per se violation of the antitrust laws; Blalock v. Ladies Professional Golf Assoc., 359 F.Supp. 1260 (N.D.Ga.1973)—a suit brought by a suspended member against the Association, held that a rule under which plaintiff was suspended in the unfettered discretion of the Association was a per se violation of the antitrust laws; Gardella v. Chandler, 172 F.2d 402 (2d Cir. 1949)—a suit by a baseball player, involving the "reserve" clause in players standard contract—held complaint sufficiently alleged restraint on interstate commerce and case remanded for trial.

Note 6

Defendants refer to the claimed 1968 statement of a former president of the AFL Players' Association to its members stating that pro-football must remain competitive if it is to attract the consumers of our entertainment product —the fans; that the history of professional sports clearly records the economic fact of life that tight pennant races attract the biggest following and to this end we support certain structural ingredients of our business—such as the draft and the option clause; also to a claimed 1970 statement of the NFL Players' Association to the effect that the NFL, as a business enterprise is unique in many respects—it is volatile, with disparity between member clubs with regard to both monetary rewards and successes on the field of play and, due to many factors, including a unique

method of sharing gate receipts, each member club has a definite and direct economic stake in the successful operation of every other member club. Plaintiff does not admit that the foregoing claimed statements were made, as claimed by defendants, or that they are sufficiently presented in context to indicate the meaning of those who may have made the statement.

## Note 8

In support of their contention of distinguishing uniqueness of sports league activities defendants cite and rely on Flood v. Kuhn, 316 F.Supp. 271, 273–276 (S.D.N.Y.1970), the District Court's decision in the baseball antitrust litigation in which the District Court, after a long trial, concluded that the baseball reserve system which accords to each club a permanently renewable option for a player's services and thus denies to a player through his career the freedom to choose his own employer, is a necessary element of league organization and should not be eliminated; also an earlier preliminary injunction ruling in the same case, 309 F.Supp. 793 n. 26 at 801 (S.D.N.Y.1970) in which the court rejected plaintiff's contention that the case merited a *per se* approach, stating that it was impressed by the argument that the rule of reason should govern because it is generally conceded that some form of reserve system is essential to the joint venture of organized professional baseball; Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (E. D.Pa.1972), in which the Court recognized (pp. 503–504, 505–512) the uniqueness of professional league sports activities and, citing Judge Cooper's findings in *Flood v. Kuhn, supra,* pointed out the need for some kind of intra-league reserve system to keep the competitive challenge of all teams within some reasonable parameter. For this reason the court expressly refrained from holding that the NHL reserve system would violate Section 1 of the Sherman Act—*per se* or otherwise—noting that any such finding would have to await a fuller record. The court's issuance of the preliminary injunction in that case was upon the theory that the particular reserve system there involved could be held a violation, not of Section 1 of the Sherman Act, but only of Section 2—a conspiracy or attempt to monopolize the supply of players available for major league professional hockey in such a way as to exclude the newly formed World Hockey League, a plaintiff in that case, from access to that player pool. Defendant in our pending case states that this *Philadelphia Hockey* case was eventually settled upon the court's suggestion that adoption of an option rule similar to the NFL option rule here involved, instead of the NHL rule there involved, would meet with the court's approval; also State of Milwaukee v. Milwaukee Braves, 31 Wis.2d 699, 144 N.W.2d 1, 10 (1966) where the court observed that one of the difficulties in dealing logically with such matters arises from the fact that major league baseball is inseparable from the existence of leagues, requiring some degree of control over competition among teams and players and some limitation of the number and capability of the constituent teams; also Cappadona v. New England Patriots, 72–1119–W (D.C. Mass. 3/7/74), a case brought by a former AFL player to challenge the NFL "Selection" or "Draft" rule, in which the court recognized that, although professional football is admittedly within some aspects of the antitrust laws, the exact scope of their application is unsettled; that it is necessary that some measures be agreed upon by the participating teams so that the economic or other advantages possessed by some teams will not be used to destroy the league and make virtually impractical the hiring of football players; that there is a difference between the scope permissible under the antitrust laws to professional sports to combine and limit their freedom, on the one hand, and what would be permissible for ordinary commercial enterprises—producing, marketing or handling tangible goods; also

United States v. NFL, 116 F.Supp. 319 (E.D.Pa.1953), in which the court concluded that NFL member clubs could legally agree that no member club could televise its games within the home area of any other member club on a day when another team was playing a home game, stating that professional football is a unique type of business; that professional teams in a league must not compete too well with each other in a business way because, if all the teams did so, the strongest teams would likely drive the weaker ones into financial failure and eventually the whole league would fail and without a league no team can operate profitably; Molinas v. National Basketball Assn., 190 F.Supp. 241, 243–244 (S.D.N.Y.1961), involving an alleged black-listing of a professional basketball player in which the court states that every league or association must have some reasonable governing rules involving some sort of restraint.

### Note 9

For the proposition that the collective bargaining process immunizes employer-employee agreements from the antitrust laws, defendants cite and rely on such cases as Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO v. Jewel Tea Co., Inc., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); Bodine Produce, Inc. v. United Farm Workers Organizing Committee, 494 F.2d 541 (9th Cir. 1974); National Association of Broadcast Employees and Technicians v. International Alliance of Theatrical Stage Employees, 488 F.2d 124 (9th Cir. 1973); Schatte v. IATSE, 182 F.2d 158 (9th Cir. 1950) cert. den. 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608 (1950); Intercontinental Container Transport Corporation v. New York Shipping Assn., 426 F.2d 884 (2d Cir. 1970). United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941) established that union conduct is generally immune from the antitrust laws. In Allen Bradley Co. v. Local 3, supra, (1945), an action by allegedly affected employers against the parties to a collective bargaining agreement, the court held that a combination of business employers was not exempt from the antitrust laws when the union was aiding the employer to create a business monopoly. (See also, United States v. Women's Sportswear Mfg. Assn., infra, (1949).

Similarly, in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court held that a collective bargaining agreement, if found to be a conspiracy of employers to eliminate their competitors, was not immune from the antitrust laws merely because of union participants in the form of collective bargaining.

On the other hand, Amalgamated Meat Cutters v. Jewel Tea, supra, (1965), decided contemporaneously with *Pennington*, was an action brought by an employer who was a party to a collective bargaining contract, against the union and other employer parties to the contract, alleging duress by the union in the interests of the employer's competitors; the court, distinguishing *Allen Bradley Co.*, held that the collective bargaining agreement was immune from antitrust attack because the "marketing hours provision" of the contract there in question fell well within the realm of "wages, hours and other terms and conditions of employment" about which employers and unions are required by the NLRA to collectively bargain.

In *National Association v. International*, supra, an action by a union against another union and certain employers, charging antitrust activity, the Ninth Circuit, citing among other authorities, Schatte v. IATSE, supra, held that defendants' collective bargaining contract, although not absolutely immune from antitrust laws, was exempt where the alleged anti-competitive agreement was aimed, not at employees of competing business interests, but was concerned with the lawful self-interest of the defendant union within the meaning of the NLRB.

In Bodine v. United Farm Workers, supra, an antitrust suit brought by growers against the farm workers union, the Ninth Circuit, considering at length the circumstances when a union may transgress the antitrust laws, held that, although union activities are for the most part exempt from the antitrust laws, the exemption is not absolute and that a complaint, alleging a union combination with others, including non-labor groups, to boycott defendants' grapes in restraint of trade was sufficient to state a cause of action.

### Note 10

In support of his contention that collective bargaining does *not* immunize antitrust activity plaintiff cites such cases as Allen Bradley Co. v. Local No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United States v. Women's Sportswear Assn., 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), wherein employer-union agreements have been held not to be immune from the antitrust laws notwithstanding their inclusion in collective bargaining contracts; also Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462, 496–500 (E.D.Pa.1972) and Boston Professional Hockey Assn. v. Cheevers, 348 F.Supp. 261 (D.Mass. 1972)—although in these last two cases the rulings on this point were really to the effect that the agreements between the league clubs and players were not sufficiently shown to have been arrived at through collective bargaining.

Philadelphia World Hockey v. Philadelphia Hockey, supra, (already referred to in our discussion of the antitrust issue, see Note 8) was an action by a newly formed professional hockey league for antitrust injunction against an established league whose players were bound by reserve clause contracts. The court (pp. 498–499), dealing with defendants' collective bargaining defense and after reviewing *Hutcheson*, *Allen Bradley*, *Pennington* and *Jewel Tea*, held that the Players' Association was not shown to have been certified by NLRB as the players' bargaining agent and, therefore, there was no recognized collective bargaining in that case. The court, however, went on to state that, even if there had been, the collective bargaining contract would not immunize antitrust conduct because the record showed that the bargaining had not been serious, extended and at arms length concerning a reserve system which had been used by the league for many years prior to formation of the Players' Association which persistently but unsuccessfully sought to revamp the system; further that, even if there had been such serious bargaining it would not shield the league from antitrust liability in a suit by a third party competitor, i. e., a new league, seeking access to players controlled by the league.

### Note 11

Defendants' contention that an interim collective bargaining agreement between the Association and the NFL, including a Standard Contract requirement, had been reached between the parties in July and August, 1970, but that the final execution of that accord was delayed until June, 1971, and was, therefore, a mere formality, is so vaguely supported by the record herein that any issue of fact on that point, even if material for the decision of this case, would not be a genuine issue within the meaning of Rule 56, Fed.R.Civ.P.