Donald **CHUY**

v.

The **PHILADELPHIA EAGLES** and the **National Football League.**

Civ. A. No. 71–1802.

United States District Court, E. D. Pennsylvania.

Jan. 14, 1976.

Leonard Schaeffer, Pechner, Sacks, Dorfman, Rosen & Richardson, Philadelphia, Pa., for plaintiff.

Lindley M. Cowperthwait, Jr., Wisler, Pearlstine, Talone, Craig & Garrity, Norristown, Pa., for Philadelphia Eagles.

Morris L. Weisberg, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Paul J. Tagliabue, Covington & Burling, Washington, D. C., for National Football League.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. Preliminary Statement

We begin with a Philadelphia Eagles-New York Giants football game on Sunday, November 2, 1969, in which the plaintiff, then an Eagles lineman, seriously injured his left shoulder while executing a downfield block. This injury led rapidly to the end of his professional athletic career. At the time of the injury plaintiff was receiving an annual salary of $30,000. Claiming that he had a three year contract with the Eagles covering the 1969, 1970 and 1971 seasons, guaranteeing him full salary for the term of the contract in case he were injured in the performance of his duties thereunder, plaintiff filed this suit to recover an alleged unpaid balance of $60,-000. The Eagles deny that any sums are unpaid or due, contending that plaintiff had a one year contract only. Another count of the complaint asserts that the Eagles defamed him when Eagles general manager Palmer ("Pete") Retzlaff falsely told the press that the plaintiff was suffering from a rare and fatal blood disease.[1] The Eagles also deny this charge.[2]

The contractual and defamation claims will be adjudicated at trial and are not addressed in this opinion, which concerns the motion of defendants for summary judgment on the remaining count of the complaint. That count, founded upon the antitrust laws,[3] alleges that the Ea-

---

1. Jurisdiction of the contractual and defamation counts is founded upon diversity of citizenship. 28 U.S.C. § 1332(a)(1) (1970).

2. The Eagles' answer denies the averments of defamation generally, in seeming violation of Fed.R.Civ.P. 8(b), but in subsequent representations the Eagles indicate that they will claim Retzlaff's statement was an unintentional mistake or innocent error.

3. Unlike the business of professional baseball, pro football enjoys no special exemption from the antitrust laws. Flood v. Kuhn, 407 U.S. 258, 282–83, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); cf. United States v. National Football League, 116 F.Supp. 319 (E.D.Pa.1953). As a result, actions of football clubs, but not those

gles and the defendant National Football League ("NFL") participated in a combination or conspiracy: (1) to restrain trade through the imposition of a "Standard Player Contract" containing inflexible and inadequate terms of compensation in the event of serious, work-related injury; and (2) to monopolize commerce in the business of professional football through strict adherence to a "player draft"[4] and other means.[5] The defendants moved for summary judgment after some three years of pretrial discovery, and the pretrial record with respect to plaintiff's antitrust claim must now be considered fully developed. Counsel have taken the depositions of plaintiff Chuy, Eagles trainer Garnett Ebert "Moose" Detty, NFL Commissioner Alvin Ray "Pete" Rozelle, and Eagles physician Dr. James E. Nixon. Both sides have propounded and answered interrogatories. The defendants' motion for summary judgment is accompanied by affidavits of Rozelle, Eagles general manager Retzlaff, Eagles business manager Leo Carlin, and Theodore W. Kheel, Esquire, representative of the NFL in their collective bargaining with the Players Association. The plaintiff submitted no affidavits in opposition to the motion.

In addition to denying the material facts averred in the complaint, the defendants raise two additional, affirmative defenses. They argue, and the plaintiff essentially concedes, that any recovery premised directly on the 1962 player draft through which the plaintiff first entered professional football is barred by the four year antitrust statute of limitations, 15 U.S.C. § 15b (1970).[6] See *Saunders v. National Basketball Ass'n,* 348 F.Supp. 649, 652–54 (N.D.Ill. 1972); *cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Continental Wirt Electronics Corp. v. Lancaster Glass Corp.,* 459 F.2d 768 (3d Cir. 1972); *Stewart Aviation Co. v. Piper Aircraft Corp.,* 372 F.Supp. 876 (M.D.Pa. 1974). The defendants also raise the spectre of the so-called "labor exemption" to the antitrust laws. See *Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Flood v. Kuhn,* 407 U.S. 258, 293–96, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (Marshall, J., dissenting); *Local 189, Amalgamated Meatcutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *Allen Bradley Co. v. Local 3, IBEW,* 325 U.S. 797, 65 S.Ct.

of baseball clubs, may violate the antitrust laws. Congress acquiesced in this anomalous situation by the passage in 1961 of what is now 15 U.S.C. § 1294 (1970):

> Nothing contained in this chapter shall be deemed to change, determine, or otherwise affect the applicability or nonapplicability of the antitrust laws to any act, contract, agreement, rule, course of conduct, or other activity by, between, or among persons engaging in, conducting, or participating in the organized professional team sports of football, baseball, basketball, or hockey . ..

*Cf.* 15 U.S.C. § 1291 (1970). Hence, if its terms are otherwise met, the Clayton Act, 15 U.S.C. § 15 (1970), gives plaintiff a private, civil cause of action for violations of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970). We have jurisdiction of the matter under 28 U.S.C. § 1337 (1970).

4. Pursuant to a provision of the NFL Constitution and By-Laws, a "Selection Meeting" of NFL clubs is held early each calendar year. There, each team is called upon in a certain

order to select prospective players of its own choice. Athletes so selected may be solicited for employment only by that team, and even if that team makes an unacceptable offer (or no offer) no other team may attempt to hire the selected player without the consent of the selecting club.

5. The complaint charges:

> 11. At all times here material, the NFL and its member clubs, including the Eagles, were parties to contracts, agreements, a combination and a conspiracy in restraint of trade, constituting a cartel, to dominate, control and monopolize the business of professional football in the United States.
>
> 12. The NFL and its member clubs, including the Eagles, contracted, agreed, combined and conspired to impose upon skilled professional football players (including the plaintiff) standard terms for their services and inadequate redress for personal injury in an inherently hazardous occupation.

6. The plaintiff does, however, rely on the draft as part of the "ambience" surrounding the negotiation and signing of the 1969 contract.

1533, 89 L.Ed. 1939 (1945); *Mackey v. NFL,* No. 4–72–Civ.–277 (D.Minn., Dec. 29, 1975); *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867, 876–78 (S.D. N.Y.1975); *Kapp v. NFL,* 390 F.Supp. 73, 83–86 (N.D.Cal.1974); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462, 496–500 (E.D.Pa.1972); Jacob & Winter, *Antitrust Principles and Collective Bargaining by Athletes,* 81 Yale L.J. 1 (1971); *cf.* 15 U.S.C. § 17 (1970); 29 U.S.C. § 52 (1970); *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 n. 14 (3d Cir. 1974); *International Ass'n of Heat & Frost Insulators v. United Contractors Ass'n,* 483 F.2d 384, 388–89 (3d Cir. 1973).

In the context of this case, however, we do not have to address or resolve the difficult issues inherent in either of these affirmative defenses, for the plaintiff's antitrust claim founders hopelessly on the most elementary and fundamental shoal of summary judgment law—he has failed to establish the existence of a single, genuine issue of material *fact* (as opposed to legal arguments, of which he has advanced many) justifying a trial, and the undisputed facts of record require judgment for the defendants on the antitrust claim.

## II. *Summary Judgment in Antitrust Cases*

■ We are mindful of Justice Clark's admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *accord, Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *cf. Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141, 1145–47 (3d Cir. 1972). Nevertheless, summary judgment is far from precluded in appropriate antitrust cases. *First National Bank*

*v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). See *Kaiser v. General Motors Corp. (Pontiac Motor Div.),* 396 F.Supp. 33, 37–39 (E.D.Pa.1975). As the Third Circuit, sitting *en banc,* has said: "Even in an antitrust case a party must . . . come forward with affidavits [or other proof beyond the pleadings] setting forth specific facts showing that there is a genuine issue for trial." *Tripoli Co. v. Wella Corp.,* 425 F.2d 932, 935 (3d Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). He "cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank, supra,* 391 U.S. at 289, 88 S.Ct. at 1592.

■ Plaintiff's brief opposing summary judgment asserts that further cross-examination of deponents Rozelle and Retzlaff may show that the plaintiff was prohibited from seeking contract modifications. He promises that "the plaintiff will be able to present his own evidence to the effect that he did seek modifications and was unable to obtain them." He adds that a trial is necessary to make "a complete examination of the market situation obtaining in professional athletics." These claims simply miss the point of a motion for summary judgment. The non-movant "cannot withhold his evidence until the date of trial but must show by some admissible evidence that there is a genuine issue as to a material fact. Plaintiff cannot rest on an ignorance of the facts . . . ." *Berry Bros. Buick, Inc. v. General Motors Corp. (Buick Motor Div.),* 257 F.Supp. 542, 545 (E.D.Pa.1966). "Moreover, if the [non-movant] was concerned about cross-examination of the affiants whose affidavits were filed by the [movant], he had ample opportunity to exercise this right in depositions and he chose not to do so." *H. Daroff & Sons, Inc. v. Strickland Transportation Co.,* 284 F.Supp. 510, 513 (E.D.Pa.1968).

Here the antitrust issue is not complex, and the proof of what the plaintiff sought in the contract negotiations is

equally, if not chiefly, in his own hands. During three years of discovery he has had ample opportunity to cross-examine hostile witnesses. But, as will be seen, he has turned nothing up.[7] We first set forth the basic (undisputed) background facts of record. We then discuss the reasons for the defendants' entitlement to summary judgment on the antitrust claim, elucidating the (remaining) undisputed facts material to resolution of the summary judgment motion in the course of that discussion.

### III. *The Basic Background Facts*

Plaintiff capped an exceptional record as star of the Nutley, N.J., high school team by winning a football scholarship to Clemson University in South Carolina. At Clemson, he was Most Valuable Player in the Atlantic Coast League and won an Honorable Mention on the 1962 All America squad. He played on the College All Star team which defeated the professional champion Green Bay Packers in 1962 and was voted outstanding lineman of that game. On the fifth round of their respective 1963 player drafts, the AFL Houston Oilers and NFL Los Angeles Rams won the opportunity to solicit the plaintiff as a prospective employee. After visiting both Texas and California, the plaintiff signed a one year, $15,000 contract with the Rams.[8] He worked for Los Angeles until 1969, when the Rams "traded" him (assigned his contract), at his request, to the defendant Eagles. Prior to the commencement of the 1969 season, plaintiff renegotiated his newly assigned contract and ultimately signed at that time three forms of contract, covering the 1969, 1970 and 1971 seasons, at $30,000 per year. (Whether as a matter of law these three forms constituted one or three "contracts" within the meaning of para-

graph 14 thereof is a question we defer until trial of the contractual issue.)

In November 1969, plaintiff suffered the injury to his shoulder mentioned above. Under the medical and paramedical supervision of Dr. Nixon and trainer Detty plaintiff played several more games, but after four weeks decided he could not or should not continue. He left Philadelphia for Los Angeles, where he still resides, in late January of 1970.

During the years involved in this case, the member clubs of the NFL, including the Eagles, used a Standard Player Contract for their employment of athletes. Each contract the plaintiff signed was in the standard form. With respect to compensation in case of work-related injury, those contracts provided:

14. In the event that Player is injured in the performance of his services under this contract, and if Player gives written notice to the Club Physician of such injury within thirty-six (36) hours of its occurrence, the Club will: (1) provide, during the term of this contract, such medical or hospital care as, in the opinion of the Club Physician, may be necessary; and (2) continue, during the term of this contract, to pay Player his salary as provided in ¶ 3 or ¶ 10 hereof, whichever is applicable if and so long as it is the opinion of the Club Physician that Player, because of such injury, is unable to perform the services required of him by this contract. Player, may, within seventy-two (72) hours after his examination by the Club Physician, submit at his own expense to an examination by a physician of his choice. If the opinion of such physician with respect to Player's physical ability to render the services required of him by this contract is contrary to that of the Club Physician, the dispute shall be

---

7. We note in this respect the marked contrast between the record in this case and the record in the case of *John Mackey et al. v. National Football League et al.*, D.Minn. No. 4–72–Civ. 277, opinion filed December 29, 1975. The exceptionally able opinion of Judge Larson in that case was founded upon an extensive record which, unlike that in the case at bar, illuminated and supported the plaintiffs'

claims. Judge Larson's opinion addressed the validity of the *Rozelle Rule* which is not before us here. *See* note 16 *infra*.

8. In 1964 and again in 1968, plaintiff signed a renewal contract or contracts with Los Angeles. Under the latter agreement(s) he earned $25,000 per annum for the 1968 and 1969 seasons.

submitted to a disinterested physician to be selected by the Club Physician and Player's physician or, if they are unable to agree, by the Commissioner, and the opinion of such disinterested physician shall be conclusive and binding upon the Players and the Club. Except as provided in this paragraph, Player's failure for any reason whatsoever to perform this contract or the services required of him by this contract . . . shall entitle the club, at its option, to terminate such contract . . . or shall entitle the Club at its option to terminate Player's salary under this contract. The Player's death shall automatically terminate this contract. . . .

If Player is injured in the performance of his services under this contract, this contract shall remain in full force and effect despite the fact that Player, following injury, is either carried by the Club on its Reserve List or is waived out as an injured player while injured; when such Player is, in the opinion of the Club physician, again physically able to perform his services under this contract, the Club shall have the right to activate such Player, and Player shall be obligated to perform his services hereunder in accordance with the terms hereof.

It is the application of this provision to him that the plaintiff essentially attacks in his antitrust count.

IV. *The Defendants' Entitlement to Summary Judgment on the Antitrust Claim*

A. *Plaintiff's Theory of the Case and the Defendants' Rejoinder: The Issues Framed*

Plaintiff has advanced two theories of liability against these defendants under the antitrust laws. One, asserted in the complaint but not pressed, is a conspiracy to monopolize the buyers' market for professional football talent. Plaintiff's second theory, and his real claim, is that the defendants (and presumably others) conspired to restrain trade by agreeing to impose on employee athletes standard, inflexible terms of compensation in the event of work-related injury. These terms, plaintiff argues, were less favorable than those which might have been freely bargained for. As a result, he concludes, when he was injured in 1970 he became eligible for no more than a lump sum payment of the full amount of his contract salary, despite his being permanently and totally disabled from performing in his chosen field as a professional athlete.

In considering a motion for summary judgment, the Federal Rules of Civil Procedure exhort us to consider whether there is a "genuine issue as to any material fact" and, if not, whether "the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). Thus we must first determine which facts in the case are "material,"[9] and then go beyond and behind the pleadings to find whether the issues as to those facts, if any, are "genuine."[10]

The elements of a private antitrust claim are three: a violation of the antitrust laws by the defendants, "a causal relationship between the antitrust violation and the alleged injury," and "measurable damage to [the plaintiff's] business or property." *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir. 1973), *cert. denied*, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). Unless the plaintiff can prove *all three* elements, his claim must fail. Thus, if the defendant

9. Material facts are those which tend to prove or disprove elements of the disputed claim for relief. *McCormick on Evidence* § 185, at 434–35 (2d ed. E. Cleary 1972). It is interesting to note that the new Federal Rules of Evidence eschew the term "material," preferring the expression "of consequence to the determination of the action." Fed.R.Ev. 401 & Adv.Comm. Note. The intended impact, if any, of Evidence Rule 401 on Civil Rule 56 is not mentioned by the Advisory Committee.

10. "A 'genuine issue' is one which can be supported by substantial evidence. . . . Summary judgment therefore is a test to determine whether there is evidence for trial." *Taylor v. Rederi A/S Volo*, 249 F.Supp. 326, 328 (E.D.Pa.1966) (citations omitted).

shows an absence of genuine dispute on the facts underlying *any one* of these elements, and a legal conclusion favorable to the defense follows from those facts, then summary judgment against the plaintiff on the antitrust claim must be granted.

In this case, the defendants assert "that the plaintiff is unable to establish even one of [the essential] elements [of a private antitrust claim], much less all three." They claim that the pretrial record relevant to alleged violations of the antitrust laws shows without dispute that there is "no NFL rule, agreement or practice (nor has there ever been) that prohibited plaintiff . . . from negotiating modifications of paragraph 14 . . . of the Standard Player Contract" and that such modifications have in fact been written into other players' contracts. They also claim that the plaintiff never sought any modification of the terms of the disability compensation clause of his contract. The defendants in effect contend that the absence of a rule or practice negates the element of violation, and that the plaintiff's acquiescence negates either the element of causation or of damages.

Answering the defendants' motion, the plaintiff responds in his brief that he lacked sufficient relative bargaining power to obtain a modification of the injury benefits provision, and that he has had no opportunity to cross-examine the defendants on whether the plaintiff sought contract modification.[11] The plaintiff did not file opposing affidavits, as encouraged by Rule 56(e), nor did he provide us with any references to parts of the depositions, interrogatories, or defense affidavits where evidence might be found to indicate the genuineness of any of these asserted issues of fact. Chiefly, he urges us to wait for trial, where testimony "can and will be produced." As

we have seen in Part II, this position cannot sustain him.

We do not rest, however, on the plaintiff's failure to pinpoint disputed facts. We have independently reviewed the pretrial record, looking for genuine issues. Having done so, we are constrained to agree with the defendants that the record fails to reveal "the slightest doubt as to the facts" on at least two of the three necessary elements. *Tomalewski v. State Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1974); see *Robin Construction Co. v. United States*, 345 F.2d 610, 613–15 (3d Cir. 1965). The plaintiff has offered no prospect of a triable issue on the existence of a violation of the antitrust laws or on the causal relationship between any assumed violation and any measurable damages.

### B. *Violation*

The plaintiff does not claim that the very terms of Paragraph 14 of the Standard Player Contract tend to restrain trade as such. Compare *Kapp v. NFL*, 390 F.Supp. 73 (N.D.Cal.1974), *vacated in part*, No. C–72–537 WTS (April 11, 1975). Rather, the alleged violation here is a combination or agreement between the NFL and its member, the Eagles, to impose inflexible terms of compensation in the event of work-related injury and to prevent employee athletes from obtaining better terms than those provided in Paragraph 14. For purposes of this part of their argument, the defendants do not deny that such a "contract, combination . . . ., or conspiracy" would violate the Sherman Act; 15 U.S.C. § 1 (1970). Instead, they maintain that there is no evidence in the extensive pretrial record tending to show the existence of any such agreement, and, indeed, that there is some evidence showing there was none.

The parties are in agreement that at the time in question the member teams

---

**11.** We have rejected the contention concerning opportunity to cross-examine in Part II, *supra*. While the plaintiff claims issues of fact relevant only to the "labor exemption," that defense will not be reached. In his brief, plaintiff also argued that the player draft constituted a *per se* violation of the Sherman Act. He abandoned that claim, however, in view of the statute of limitations. *See* Part I, *supra*.

of the NFL, including the Eagles, agreed to use the Standard Player Contract, at least as the starting point for individual negotiations.[12] The parties also agree that each employee's annual salary was always negotiable. The plaintiff's position in his memoranda has been that salary amount was the *only* negotiable item; the defendants, without admitting that anything was nonnegotiable, claim that "compensation" generally, including compensation in case of injury, certainly was, too. The affidavit of Commissioner Rozelle says:

> 6. There has been no rule, agreement or practice within the NFL during my period as Commissioner or, to the best of my knowledge, during any prior period that prohibited Mr. Chuy or any other player from negotiating modifications and/or supplements to Paragraph 14 or other provisions of the Standard Player Contract to provide for additional compensation, over and above that provided in Paragraph 14 of the Standard Player Contract, in the event of an injury.

Rozelle's deposition is to the same effect, as is the affidavit of Eagles general manager Retzlaff, and despite cross-examination and other discovery no evidence to the contrary has emerged.

█ Attached to the Rozelle affidavit and deposition are thirteen contracts which the defendants claim show negotiated variations in the injury compensation provisions, and others are attached to Retzlaff's affidavit. All of these contracts cover periods when the plaintiff was in professional football, and some of the exhibits are contracts between the Eagles and teammates of the plaintiff. Most were negotiated by average, professional athletes, not "superstars." [13] None of these exhibits shows variations in Paragraph 14 the same as those the plaintiff's memoranda speculate he might have negotiated. However, they do include terms of compensation in the event of injury more favorable to the employee than the standard terms. *See* note 13, *supra.* Accordingly, these contracts constitute some evidence tending to show the absence of any agreement to forbid such alterations. There is no contrary evidence, nor is there a prospect after three years of discovery that any will be discovered. Accordingly, we find no genuine issue as to any fact material to the violation element of plaintiff's cause of action.

### C. *Causation or Damages*

Only a person suffering measurable injury from an asserted antitrust violation may sue to recover on account of it. The very terms of the statute creating the cause of action, 15 U.S.C. § 15 (1970), reach only those claims occasioned "by reason of" the asserted violation of the Sherman Act. Under 15 U.S.C. § 1 (1970), the plaintiff must show that the alleged restraint on trade—in this case, a conspiracy to impose standard, inflexible contract terms on prospective employee

---

12. Indeed, the defendants claim that use of the Standard Contract has been required since 1968 by the terms of a collective bargaining agreement with the Players Association.

13. The contracts filed of record as exhibits have been altered to delete the names and annual salaries of the employees. We have examined original, unaltered copies of these contracts *in camera,* however, and we note that the players involved, like the plaintiff, are not "stars," much less "superstars," and plaintiff has not suggested any reason to believe that they had superior bargaining power to the plaintiff, or that they constitute "the exception that proves the rule." Nor has the plaintiff come forward with any evidence through discovery to suggest that they are not what the defendants say—examples from among many who have negotiated different terms of compensation in case of injury. The NFL athletes who obtained nonstandard contract terms affecting paragraph 14 include Mike Curtis, Robert Nichols, Mike Dennis, Robert Pickens, James Johnson, Allen Brown, and Thomas Mack. From the Eagles, Benjamin Hawkins, John Lee Osmond, 3rd, Gary Pettigrew, Harry Jones, and Cyril Pinder were included. Some of these athletes' contracts guaranteed them full salary in the event of injury regardless of the injury's cause; others were "no-cut" or "non-release" contracts; and one provided for a $10,000 payment in each of the fifth and sixth years following the contract year, even if the employee failed to play out the year.

athletes—caused him a commercial loss. See *Molinas v. National Basketball Ass'n,* 190 F.Supp. 241, 243 (S.D.N.Y. 1961). Under § 2, by contrast, the plaintiff's burden is to show that he had a commercial interest in the market which the defendant sought to monopolize, *i. e.,* the football team or football league "market." See *San Francisco Seals, Ltd. v. National Hockey League,* 379 F.Supp. 966, 971–72 (C.D.Cal.1974).

▮ Here, while plaintiff asserts a claim for damages for defamation and for breach of the injury compensation provision of his contract, he does not appear to assert that any injury to his "business or property," 15 U.S.C. § 15 (1970), arose directly out of an antitrust violation, but rather that the terms of the Standard Player Contract illegally limit the extent of his possible contract recovery.[14] His claim is at least one step less direct and far more speculative than those made in such cases as *Kapp v. NFL,* 390 F.Supp. 73 (N.D.Cal.1974); *Radovich v. NFL,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Boston Professional Hockey Ass'n, Inc. v. Cheevers,* 348 F.Supp. 261 (D.Mass.), *remanded,* 472 F.2d 127 (1st Cir. 1972); or *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049 (C.D.Cal.1971) (*"Haywood"*). Each of the athletes in those cases suffered or was threatened with direct loss "by reason of" enforcement of the challenged policy. *Radovich* involved a concerted boycott of a player-coach who had worked in a competing league. *Cheevers* and *Haywood* raised the antitrust laws as a *defense* when

their erstwhile teams sued them for breach of contract. *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462 (E.D.Pa.1972), primarily involved a monopoly (§ 2) challenge by a new hockey league to the established league's enforcement of the "reserve clause" against players seeking to change leagues.[15] There, too, when the NHL sought to enforce the clause, individual athletes had standing to challenge it by way of defense. *Id.* at 518. Kapp alleged that the defendant "in effect, drove [him] out of professional football," 390 F.Supp. at 75, by application to him of the "Rozelle Rule,"[16] after he refused to sign a contract in the standard form. *Id.* at 77–78. The plaintiff in this case stands in none of their shoes.

▮ Nor does he have direct standing to complain of a violation of 15 U.S.C. § 2 (1970), relating to monopolies. Even assuming the NFL's dominance in professional quality football amounted to an unlawful monopoly,[17] plaintiff does not allege any hindered or thwarted effort to compete in the market for professional football leagues. *San Francisco Seals, supra,* 379 F.Supp. at 971; compare *Philadelphia Hockey, supra,* 351 F.Supp. 462. See generally *In re Multidistrict Air Pollution, M.D.L. No. 31,* 481 F.2d 122 (9th Cir.), *cert. denied, Morgan v. Automobile Manufacturers Assn.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51, 54 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

---

**14.** The purported antitrust violations have no apparent bearing on the defamation claim.

**15.** The football version of the "reserve clause," called the "option clause," permits a club to require an athlete seeking to change teams at the termination of a contract period to work one additional season for his old club at "not less than" 90% of the contract salary ("play out his option") before becoming a "free agent" eligible to deal independently with any other team.

**16.** The "Rozelle Rule" provides in substance that no team may hire a "free agent" who has "played out his option" (*see* note 15, *supra*)

without paying a "ransom," approved by his former team or by Commissioner Rozelle, to the team from which the athlete broke away. The "ransom" may consist of the transfer of one or more players from the active, reserve or selection list of the player's new team, or a sum of money, or both. *See Mackey v. NFL, supra* note 7, holding the Rozelle Rule to be a *per se* violation of the antitrust laws.

**17.** *But cf.* 15 U.S.C. § 1291 (1970) (Congress' explicit 1966 approval of the AFL–NFL merger); *American Football League v. NFL,* 323 F.2d 124 (4th Cir. 1963).

The conclusion that the plaintiff could not prove his case at trial gains further support when this case is examined from another vantage. There is simply nothing in the pretrial record to suggest that the plaintiff desired or sought a different injury compensation clause from the standard one he signed. We do not suggest that mere acquiescence by the plaintiff bars his claim. See *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139–40, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Nor do we mean to suggest that a persistent or even an explicit demand by the plaintiff for an alternative arrangement is a prerequisite to a successful claim under § 1. Where experience or other evidence shows such a demand would have been futile, its absence is excusable. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 n. 15, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). *Cf. Ungar v. Dunkin' Donuts of America, Inc.*, 68 F.R.D. 65, 97–116, 139–40 (E.D.Pa.1975), *app. pending*, No. 75–1625 (3d Cir.) (suitability of class action challenge to illegal "tie").

In this case, however, the undisputed pretrial record shows not only that the plaintiff willingly embraced the contract provision he now challenges, but also that an attempt to negotiate concerning injury compensation neither was nor seemed futile. *See* Part IV.B. *supra*. As a result, even if the plaintiff might be said to have "standing" under § 1, there is no doubt of his inability to prove damages. In the first place, his theory of damages is wholly speculative: what alternative compensation plan might he have negotiated had he thought of and desired it? In addition, all the evidence points to the conclusion that he affirmatively embraced this aspect of the contract. Thus, any relative loss of benefits came as a result of his own affirmative choices, and not any acts of the defendants. We do not even have an affidavit of the plaintiff seeking to explain away the damning admissions in his deposition, all relied on by the defendants in their motion papers:

> [O]nce I got to California, . . . I just told the Rams I would like to sign a contract, and I told the Rams what I wanted. They said, 'Fine.'
>
> I signed it.

Chuy Dep. at 51–52.

Q. But you never had any discussion [with Los Angeles] about salary payments in the event of an injury?

A. No, it had never been discussed at negotiations.

*Id.* at 56.[18] Nor was there ever a discussion of deferred compensation. *Id.* at 58–61, 75–76.

Q. [As a wrestler,] did you incidentally set up any plan that would give you compensation in the event you were injured?

A. No.

Q. Did you ever consider doing that?

A. Never.

Q. Why not?

A. I told you before, I just—I was just interested in doing what I was doing. I was making my living doing that. I was content. I enjoyed what I was doing. I never had any fear of ever being crippled, or I never thought about it. I didn't have time for it when I was playing professional football. In some businesses you do your job and you have people handle that for you.

*Id.* at 87.

Q. Do you claim that if it were not for Paragraph 14 of the Standard Player Contract, you would have negotiated with the Eagles some

---

**18.** The plaintiff commented that during his aborted discussions with Houston he was not concerned with injury compensation because "that was a completely negative thing to think of. You have to concentrate on playing football, because if you worry about this you never accomplish any job." Chuy Dep. at 55.

form of a provision providing long-term compensation in the event of a disabling injury?

A. I mentioned—before, when I mentioned a contract, I was not concerned with an injury. It was established in that contract that when a football. player is injured, he was compensated by the club for that year, regardless of whether he made the roster or not. In other words, you don't have to worry about anything, you just went out and did your best job. I would never have thought of signing up if this Paragraph 14 was not in the contract. No, I did not.

*Id.* at 114–15.

Q. Do you claim that any rule of the National Football League prevented you from modifying Paragraph 14 of the Standard Player Contract?

.    .    .    .    .

A. No, because I believed in the National Football League and the Philadelphia Eagles when I signed that paper. I believed they would keep up their end of the bargain.

*Id.* at 117–18.

■ Clearly, the plaintiff's own position is not that he has been deprived of a recovery better than that afforded in Paragraph 14, but that he believes the defendants have refused to comply fairly with that provision, which he originally found (and apparently still finds) entirely satisfactory. This state of facts supports his contract claim, but not his antitrust claim. A dispute on an issue of fact is not "genuine" within the meaning of Rule 56 where not even slight evidence is developed before trial. The motion must be granted on this ground as well.

### D. *Conclusion*

■ In summary, we find that the ultimate material facts are undisputed with respect to the plaintiff's antitrust claim. On this record we cannot say that the plaintiff suffered any injury to his "business or property by reason of" any rule, practice or contract provision other than Paragraph 14 of his Standard Player Contract. The plaintiff never desired, sought, or even contemplated an injury compensation provision different from Paragraph 14. The defendants never agreed or sought to prevent the plaintiff from negotiating a different injury compensation plan, nor did they actually prevent him from doing so. Moreover, it did not seem futile to the plaintiff to seek alternative terms, and there is evidence before us that it was not futile.

Based on these ultimate facts we conclude as a matter of law that the plaintiff has not, for Rule 56 purposes, implicated a violation of the antitrust laws. Additionally, he lacks standing to complain of any purported violation of § 2 of the Sherman Act by these defendants. In short, the plaintiff has suffered no measurable injury to "his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (1970). Accordingly, summary judgment will enter for the defendants on plaintiff's antitrust claim. So much of the prayer for relief in the complaint as requests damages or counsel fees under the Sherman Act or the Clayton Act is likewise denied. Since no other claim for relief against the defendant National Football League is presented, the NFL is dismissed from this case.

Nothing in the foregoing opinion is intended to suggest any conclusion with respect to plaintiff's contract or defamation claims. A final pretrial conference will be held on January 19, 1976, at 4:00 P.M., with respect to those issues. An appropriate order follows.