**Frederick Ryan HAYES, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, an Unincorporated Association, et al., Defendants.**

**No. CV 76–3911–AAH.**

United States District Court,
C. D. California.

April 25, 1979.

See also, D.C., 469 F.Supp. 252.

Leonard Schaeffer, Philadelphia, Pa., for plaintiff.

Jeffrey I. Weinberger, Los Angeles, Cal., for defendants Los Angeles Rams and Carroll Rosenbloom.

Joseph M. Malkin, Los Angeles, Cal., for defendants National Football League and the remaining defendants on Count 1.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

The above-entitled cause came on regularly for hearing on March 19, 1979 before the United States District Court, Central District of California, the Honorable A. Andrew Hauk, United States District Judge, presiding, upon motion of defendants for summary judgment on Count I of plaintiff's complaint and motion of plaintiff for partial summary judgment on Count I.

Leonard Schaeffer, Esq., appeared for plaintiff; Jeffrey I. Weinberger, Esq., appeared for defendants Los Angeles Rams and Carroll Rosenbloom; and Joseph M. Malkin, Esq., appeared for defendants National Football League and the remaining defendants on Count I.

The Court having considered the cross-motions for summary judgment and partial summary judgment, and the papers filed concurrently therewith in support of said motions, and the papers filed in opposition to said motions, as well as all other pleadings, papers and documents on file herein, and having heard argument in open court and the Court having orally announced its decision;

WHEREFORE, good cause appearing therefore, the Court now makes its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. Plaintiff, Frederick Ryan ("Rick") Hayes, is an individual and a resident of the State of Washington.

2. The defendants on Count I of plaintiff's complaint are the National Football League ("NFL"), an unincorporated nonprofit association, NFL Commissioner Pete Rozelle, the 28 current member-teams of the NFL, five present or former partners of one NFL-member limited partnership and the owner of the Los Angeles Rams ("Rams"). The NFL organizes and establishes the playing-field rules for professional football games among its member-teams.

3. Two of the defendants, the Seattle Seahawks and the Tampa Bay Buccaneers, were not members of the NFL in 1974, the year relevant to plaintiff's claim. Neither began play within the NFL until the 1976 season.

4. Count I of plaintiff's complaint alleges that the defendants "were parties to contracts and agreements, which resulted in a conspiracy to restrain trade and a combination in restraint of trade." It is brought under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1–3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

5. The specific violations of the antitrust laws alleged by plaintiff are that the "Standard Player Contract" form in use in the NFL in 1974 "deprived [plaintiff] of his right to bargain in a free market for adequate protection for himself in the event of physical injury in an inherently hazardous occupation" and that the NFL player selection draft "deprived [plaintiff] of the opportunity to bargain for the true market value of his services as a skilled professional football player" because "plaintiff could contract for his services as a skilled professional football player only with the defendant RAMS."

6. Plaintiff played college football as an offensive tackle at the University of Washington during the period from 1969 through 1974.

7. In college, plaintiff suffered a variety of injuries and sat out one entire football season with an elbow injury received in the first game of the year. As a result of missing this year, plaintiff remained in college for a fifth or second "senior" year in order to play college football for the full four years of his eligibility under NCAA rules. Plaintiff received the following serious injuries in college: two knee injuries, a fatigue fracture of his lower right leg, the dislocated elbow which kept him on the bench during his first "senior" year, a neck injury requiring surgical fusion of vertebrae which kept him out of spring practice in 1972, and an ankle injury aggravated by continued physical activity which kept plaintiff out of spring practice in 1973 and which ultimately required surgery.

8. During his college football career, plaintiff was never selected as an All-American and never made any post-season All-Pacific-8 Conference team. The only post-season football honor of any kind that plaintiff ever won was his invitation to appear in the 1974 Hula Bowl in Hawaii.

9. Plaintiff was chosen by the Los Angeles Rams as the 24th selection in the 11th round of the 1974 NFL player selection draft. This means that all 26 of the teams in the NFL at that time passed over the opportunity to acquire priority negotiation rights to plaintiff's services through 10 successive rounds and plaintiff was the 284th player selected in that year's draft.

10. Subsequent to the 1974 NFL draft, plaintiff placed total negotiating authority with respect to his hoped-for professional football career in the hands of his father, Ray Hayes, a Tacoma attorney. Attorney Hayes, a self-described "general practitioner in a field that was completely over his head," thereafter conducted negotiations on plaintiff's behalf with both the Rams and teams in the WFL.

11. On June 4, 1974 plaintiff signed two "Standard Player Contract" forms with the Los Angeles Rams. The first of these gave plaintiff an $8,000 "signing" bonus, annual compensation (subject to the terms of the contract) of $22,000 and certain bonus provisions. The second provided for annual compensation (subject to the terms of the contract) of $26,000 and contained different bonus provisions. Each provided in Paragraph 6 that the team would have the right to terminate plaintiff's employment if, among other things, he failed "to demonstrate sufficient skill and capacity to play professional football."

12. In 1974 the NFL employed a player contract form known as the "Standard Player Contract." This form was primarily useful as a convenient device for effective administration of the League. Its filing with the NFL office officially represented the assumption of contract status by each player executing the form. The use of the League form ensured a full and unambiguous statement of each player's contract relationship with his club and within the League. The use of an official form also enabled the NFL office to ensure that each player's contract complied with the terms of any NFL collective bargaining agreement then in effect and enabled the League conveniently to administer and supervise the great volume of contract assignments, player waivers and releases and disputes and grievances which annually occurred (in the 1974 time period over 2,000 players came under contracts to NFL clubs annually).

13. Beginning in 1968, and continuing to the present date, the terms and conditions of player employment within the NFL have periodically been exposed to and the subject of collective bargaining between the NFL players' union and the NFL club-employers collectively. A major subject of such collective bargaining, through three successive collective bargaining rounds, has been the terms of the NFL player contract form. The NFL player contract forms have served the purpose of establishing a "floor" under player rights, i. e., of guarantying to all NFL players the minimum contract protections set forth in the standard forms.

14. At no time during 1974 was there any rule, agreement, or practice requiring that NFL players and their clubs enter into contracts solely on the basis of the contract terms set forth in the "Standard Player

Contract" form. Departures, deviations, and supplements providing additional protections for players have always been permitted and have regularly been included in contracts submitted to and approved by the League office. No League policy or practice prevented players and their clubs from negotiating between themselves special provisions relating to their own contract relationship.

15. The right of NFL players to negotiate modifications or supplements to the NFL player contract form providing contract benefits or protections above and beyond those provided in the form has been known to players, their agents, their attorneys, and to all NFL clubs for a generation. The privilege was specifically acknowledged in the 1974 NFL Constitution & By-Laws (Art. XV, § 15.1).

16. In 1974 the member clubs of the NFL and their player-employees commonly executed contracts containing a wide variety of modifications and/or supplements to the "Standard Player Contract" form. These modifications were negotiated by the individual member clubs and the players (or their representatives) in order to tailor the contracts to the individually-negotiated agreements reached between each player and his individual club. They included provisions for additional compensation, over and above the provisions of Paragraph 14 of the "Standard Player Contract," in the event of the player's injury (injury protection provisions).

17. Paragraph 14 of the "Standard Player Contract," the injury protection provision, was reasonable.

18. In 1974 there was no rule, agreement, practice, or understanding within the NFL or among the member clubs of the NFL or with the NFL which in any way prohibited the present plaintiff or any other player from negotiating modifications of or supplements to Paragraph 14 or other provisions of the "Standard Player Contract" form to provide for additional compensation, over and above that guaranteed all players, in the event of an injury.

19. At no time during the negotiations with the Rams did plaintiff or Attorney Hayes ask for any change in the terms of the "Standard Player Contract" form that plaintiff did not receive. At the request of Attorney Hayes, a typed "Collective Bargaining Clause" was added to the first of the "Standard Player Contract" forms that plaintiff signed.

20. During the negotiations with the Rams, Attorney Hayes endeavored to convince the Rams that plaintiff was in good health and physically fit to play professional football.

21. At no time during the negotiations with the Rams did plaintiff or Attorney Hayes ask for any change in the terms of the "Standard Player Contract" form relating to injury protection.

22. Plaintiff was placed on waivers by the Rams on August 18, 1974. No other NFL team claimed his contract and plaintiff was released a day or two later.

23. The use of the "Standard Player Contract" form was not the cause in fact of any injury to plaintiff.

24. The cause of any injury to plaintiff from the terms of the "Standard Player Contract" was plaintiff's own failure to ask for any different terms.

25. Plaintiff did not suffer any injury to his business or property as a proximate result of the use of the "Standard Player Contract" form.

26. For purposes of this motion, no other fact is material.

27. Any conclusion of law hereinafter recited which should be deemed a finding of fact is hereby adopted as such.

## CONCLUSIONS OF LAW

1. The Court concludes in all respects as set forth in the foregoing findings of fact. Any finding of fact which should be deemed a conclusion of law is hereby adopted as such.

2. In order to establish his antitrust claim against the defendants, plaintiff must prove (1) a violation of the antitrust

laws by the defendants; (2) injury to his "business or property"; and (3) a direct causal relationship between the violation and the injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Kapp v. National Football League*, 586 F.2d 644 (9th Cir. 1978).

■ 3. Plaintiff is entitled to no relief if his failure to obtain different contract terms is attributable to his own failure to make a request. *Cleary v. National Distillers & Chemical Corp.*, 505 F.2d 695, 697 (9th Cir. 1974).

■ 4. Defendants Seattle Seahawks and Tampa Bay Buccaneers, not having been members of the NFL in 1974, cannot have been part of any alleged combination in restraint of trade which injured plaintiff.

■ 5. There was no rule, agreement, practice, or understanding within the NFL or among the member clubs of the NFL or with the NFL which in any way prohibited the present plaintiff or any other player from negotiating modifications or supplements to Paragraph 14 or other provisions of the "Standard Player Contract" form. Plaintiff and the Rams were free to agree upon additional compensation, over and above that guaranteed all players, in the event of an injury. *Chuy v. Philadelphia Eagles*, 407 F.Supp. 717 (E.D.Pa.1976).

■ 6. The use of the "Standard Player Contract" form was not the result of any combination in restraint of trade and did not constitute a *per se* antitrust violation.

■ 7. Paragraph 14 in the "Standard Player Contract" form was reasonable.

■ 8. Assuming *arguendo*, for purposes of this motion only, that the use of the "Standard Player Contract" form did constitute an antitrust violation, the use of this form was not the cause in fact of any injury to plaintiff.

9. The cause of any injury to plaintiff from the terms of the "Standard Player Contract" was plaintiff's own failure to ask for any different terms.

10. Plaintiff did not suffer any injury to his business or property as a proximate result of the use of the "Standard Player Contract" form.

11. The aforesaid findings and conclusions having been made upon issues which are determinative of the cause, any further findings and conclusions or findings and conclusions upon issues other than those embraced in the foregoing would be immaterial and are not made for that reason.

12. Defendants are entitled to partial summary judgment on Count I of the complaint with respect to plaintiff's claim that the use of the "Standard Player Contract" form constituted an antitrust violation which caused injury to his business or property.

Let judgment be entered accordingly.