RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DIEGO PAVIA,

*Plaintiff-Appellee*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellant*.

No. 24-6153

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:24-cv-01336—William Lynn Campbell, Jr., District Judge.

Argued:  September 16, 2025

Decided and Filed:  October 1, 2025

Before:  THAPAR, READLER, and HERMANDORFER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Rakesh Kilaru, WILKINSON STEKLOFF LLP, Washington, D.C., for Appellant. Ryan Downton, THE TEXAS TRIAL GROUP, Dorado, Puerto Rico, for Appellee. **ON BRIEF:** Rakesh Kilaru, Daniel Epps, WILKINSON STEKLOFF LLP, Washington, D.C., for Appellant. Ryan Downton, THE TEXAS TRIAL GROUP, Dorado, Puerto Rico, Salvador M. Hernandez, RILEY & JACOBSON, PLC, Nashville, Tennessee, for Appellee.  Jessica L. Ellsworth, Reedy C. Swanson, HOGAN LOVELLS US LLP, Washington, D.C., for Amici Curiae.

        THAPAR, J., delivered the opinion of the court in which READLER and HERMANDORFER, JJ., concurred.  THAPAR (pp. 10–15) and HERMANDORFER (pp. 16–20), JJ., delivered separate concurring opinions.

————————————

**OPINION**

————————————

THAPAR, Circuit Judge.  After a breakout year in 2024, Diego Pavia wanted to continue playing quarterback for Vanderbilt University during the 2025 football season.  But National Collegiate Athletic Association (NCAA) eligibility rules barred him from playing.  So he sued the NCAA.  After he won a preliminary injunction, the NCAA appealed.  But in the meantime, the NCAA gave Pavia exactly what he wanted—a waiver that guaranteed he could play for Vanderbilt in 2025.  Because that waiver provides Pavia complete relief at the preliminary-injunction stage, we dismiss the NCAA's appeal as moot.

I.

Diego Pavia was a champion wrestler, but an unlikely football star.  As a six-foot-tall high schooler in the 160-pound weight class, Pavia didn't profile as the ideal college quarterback.  Top college scouts weren't exactly breaking down his door.  Although he received two offers to play football at NCAA member schools, they were from Division II programs.  But Pavia dreamed of playing in Division I, the highest level of NCAA football.  So Pavia instead enrolled at the New Mexico Military Institute (NMMI) in 2020.

NMMI is a two-year junior college (JUCO) in the National Junior Collegiate Athletic Association (NJCAA).  Pavia played only eight games for NMMI in 2020, because COVID-19 lockdowns shortened the season.  But in 2021, Pavia quarterbacked NMMI to an NJCAA national championship.  His stellar performance earned him a ticket to his Division I dreams—a transfer to New Mexico State University (NMSU).  And after two seasons there, Pavia graduated and transferred to Vanderbilt University, a member of the storied Southeastern Conference (SEC).

Pavia and Vanderbilt achieved historic success in the 2024 season.  They defeated the University of Alabama, the top-ranked team in the country, on the way to Vanderbilt's first bowl-eligible season since 2018.

The 2025 season promised Pavia many opportunities. He could write new chapters in Vanderbilt football history. He could make an impression on scouts from the NFL. And he could make more money. In fact, Pavia believed he could make more than a million dollars in compensation for his name, image, and likeness (NIL) in the 2025 season. Multiple organizations approached him with potential NIL contracts. These offers were a huge change from Pavia's junior-college days, when he made no NIL money at all.

But NCAA rules stood in the way. One of those rules prevents college athletes from playing more than four seasons of "intercollegiate competition" in one sport. NCAA Division I Bylaw 12.8, R. 1-2, Pg. ID 86. And a player must complete those four seasons "within five calendar years" of the first academic term in which the player enrolls at a full-time college. *Id.* 12.8.1, R. 1-2, Pg. ID 86. Most important to Pavia, though, is the "JUCO Rule." This rule provides that "intercollegiate competition" includes seasons played for "a two-year or a four-year collegiate institution . . . in any contest against outside competition." *Id.* 12.02.6(a), R. 1-2, Pg. ID 66. Thus, the NCAA counts junior-college seasons toward a player's maximum of four seasons of eligibility.

The JUCO Rule blocked Pavia from playing in the 2025 football season. Recall his path to Vanderbilt. Pavia first enrolled in 2020 at NMMI, a two-year junior college. He played two seasons there before playing two at NMSU and one at Vanderbilt. But the NCAA didn't count his 2020 season at NMMI for its eligibility rules. Because COVID-19 had shortened athletic seasons, the NCAA granted all college athletes a waiver—effectively giving them an extra year of college play. Thus, by the end of the 2024 season, for eligibility purposes, Pavia had played four seasons of intercollegiate competition. That's because the JUCO Rule counted his 2021 season for NMMI against his eligibility in Division I. The upshot? Pavia couldn't play for Vanderbilt in 2025.

In response to his pending ineligibility, Pavia sued the NCAA in the fall of 2024. He alleged that by counting junior-college seasons in his four permitted years of intercollegiate competition, the NCAA violated Section 1 of the Sherman Act. 15 U.S.C. § 1. Among other remedies, Pavia sought injunctive relief that would allow him to play in the 2025 and 2026 seasons.

Pavia then moved for a temporary restraining order and a preliminary injunction allowing him to play in the 2025 season only.  He also asked the court to enjoin the NCAA from enforcing its restitution rule based on Pavia's participation in the 2025 season.  The restitution rule allows the NCAA to punish a college if an otherwise ineligible player for that college wins an injunction and plays under it, but a court later eliminates the injunction.

The district court granted Pavia's motion for a preliminary injunction.  It enjoined the NCAA from enforcing the JUCO Rule against Pavia during the 2025 season.  And it enjoined enforcement of the restitution rule against Vanderbilt and Pavia based on Pavia playing in the 2025 season.  The NCAA timely appealed.

After the grant of the preliminary injunction, the NCAA issued a waiver allowing all players in Pavia's position to play one more season in 2025.  Any player who had enrolled full-time and used a season of competition at a non-NCAA school could play in the 2025 season, as long as he had used his fourth and final season of competition in 2024 and was otherwise eligible.  The NCAA later confirmed that the waiver covered Pavia.  And it represented that the waiver would remain in effect for the 2025 season no matter the outcome of the preliminary-injunction appeal.  Pavia shares that understanding of the waiver's scope and effect.

## II.

Because of the NCAA waiver, the appeal is moot.  So we must dismiss for lack of jurisdiction.

Article III of the Constitution limits federal courts to deciding "Cases" or "Controversies."  U.S. Const. art. III, § 2.  Those cases or controversies remain justiciable only as long as we can grant "effectual relief" to the parties.  *Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. 2024) (en banc) (per curiam) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).  To be "effectual," the complaining party's requested relief must have some "practical effect" on the litigants.  *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020).  That remains true at every stage of a case—including, as relevant here, on appeal of a preliminary injunction. *Id.*  If intervening events make the preliminary injunctive relief lack "practical effect," the appeal is moot, and we must dismiss the appeal for lack of jurisdiction.  *See Resurrection Sch. v. Hertel*,

35 F.4th 524, 528 (6th Cir. 2022) (en banc).  That's true even if "the *underlying lawsuit* is not moot."  *Brown*, 122 F.4th at 602 (emphasis in original).

In his motion for a preliminary injunction, Pavia requested two kinds of relief.  He asked the district court to stop the NCAA from enforcing several rules "to prevent [Pavia] from playing college football in the 2025-26 season."  R. 8, Pg. ID 541.  And he asked the court to block enforcement of the NCAA's restitution rule.  The district court granted the preliminary injunction, and the NCAA asks that we reverse that grant.  *See Welty v. Dunaway*, 145 F.4th 628, 630 (6th Cir. 2025) (per curiam) (observing that an "appeal becomes moot . . . when an intervening event makes it impossible for us to grant any effectual relief . . . in favor of the appellant" (cleaned up)).

No matter the outcome of this appeal, Pavia has already obtained the full relief he initially sought by requesting a preliminary injunction.  And the NCAA's requested relief of reversal will accomplish nothing, as Pavia will play with or without the preliminary injunction.  The NCAA's blanket waiver covers Pavia because he was otherwise eligible to play in 2025 without the JUCO Rule.  So Pavia can play—and is playing—quarterback for Vanderbilt during the 2025 football season.  His eligibility also makes the restitution rule irrelevant.  The NCAA can't enforce it against Vanderbilt because Pavia is not competing while "ineligible" or "contrary" to NCAA rules—the NCAA's own waiver covers him.  NCAA Division I Bylaw 12.11.4.2, R. 1-2, Pg. ID 97.  Because he can play in the 2025 season and the restitution rule doesn't apply, Pavia has already obtained all the relief he requested in the preliminary injunction.  And because the NCAA has voluntarily permitted Pavia to play, a ruling in its favor would have no "practical effect."  *Resurrection Sch.*, 35 F.4th at 528.  We can't give either party any further "effectual relief," so we lack jurisdiction over the appeal.  *Brown*, 122 F.4th at 602.

The parties' arguments against mootness fail.  Pavia claims that his efforts to prevail on the merits below depend on our ruling.  He notes that the district court stayed discovery pending our decision, seeming to contend that his lawsuit may proceed in the district court only if we rule in his favor.  He is incorrect.  At the preliminary-relief stage, our ruling on the merits will not affect discovery below.  It merely decides the status quo as his lawsuit proceeds.  *See Adams v. Baker*, 951 F.3d 428, 429 (6th Cir. 2020) (per curiam).  And the presence of a live controversy

below doesn't change our inability to grant effectual relief—so it doesn't affect mootness. *Brown*, 122 F.4th at 602.

In a similar vein, the NCAA worries that Pavia will seek more years of eligibility and use the preliminary injunction to support his attempt to play in the 2026 season. Yet this, too, doesn't relate to whether we can give either party relief at the preliminary-injunction stage. Pavia may indeed continue his case on the merits and pursue eligibility for the 2026 season, but he has received everything he requested at this preliminary stage. Because our review is limited to the district court's grant of the preliminary injunction, the fact that "the *underlying lawsuit* is not moot" doesn't affect our inability to grant relief now. *Id.* (emphasis in original).

Both Pavia and the NCAA also unsuccessfully claim that an exception to mootness applies. They argue that this issue is "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). This exception applies "only in exceptional situations" where two conditions are met. *Id.* (quoting *Spencer*, 523 U.S. at 17). First, the challenged action must be so short in time that the case can't be fully litigated before the action ends. *Id.* And second, there must be "a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quoting *Spencer*, 523 U.S. at 17) (cleaned up). Neither of these conditions is met here.

First, the NCAA's application of its JUCO Rule to Pavia isn't so short as to evade review. "[B]y their nature," challenges to the JUCO Rule won't become moot before litigation ends. *Radiant Glob. Logistics, Inc. v. Furstenau*, 951 F.3d 393, 396 (6th Cir. 2020) (per curiam). In fact, if the NCAA had not issued a waiver, we would have had time to review the injunction and hand down a decision before the end of the 2025 season. Instead, in late 2024, the NCAA committed to allowing Pavia to play, so the mootness of the appeal made expedited review through the appellate process less important. And another circuit has ruled on a challenge similar to Pavia's in plenty of time to affect the athletic season in question. *See Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 863, 865 (7th Cir. 2025). Because the parties have time to litigate the validity of the NCAA's eligibility rules, those rules won't escape review indefinitely.

Second, Pavia won't be subject to the same action again. A party seeking to avoid mootness must show a "reasonable expectation that the same complaining party [would] be subject[ed] to the same action again." *Kingdomware Techs.*, 579 U.S. at 170 (quoting *Spencer*, 523 U.S. at 17). Here, Pavia is the complaining party. The NCAA's action was to block Pavia from playing in the 2025 season based on the JUCO Rule. And all the motion for a preliminary injunction sought was a ruling permitting Pavia to play in 2025 while his suit continued. Because the NCAA has now admitted he can play regardless of what we do, he will not be banned in 2025. Thus, the action now before us—the NCAA's enforcement of the JUCO Rule to bar Pavia's participation in the 2025 season—is not capable of repetition. *See Chirco v. Gateway Oaks, LLC*, 384 F.3d 307, 309 (6th Cir. 2004).

The NCAA suggests that Pavia's ability to sue the NCAA again for another season of competition might satisfy the exception, but it doesn't. In this case, Pavia has already sued the NCAA for an additional season of competition in 2026. That claim involves a different season and distinct limits on eligibility that the preliminary-injunction decision didn't address. This "live controversy" on the merits means the NCAA will have its day in court regarding the 2026 season. *Furstenau*, 951 F.3d at 396. So the NCAA wouldn't be "again" subjected to suit, because that suit is already in progress and amenable to timely resolution. *Chirco*, 384 F.3d at 309. In sum, the injury to Pavia isn't "capable of repetition, yet evading review."

There is one other theoretical obstacle to mootness. A defendant generally can't moot a case just by voluntarily ceasing its challenged practice. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Otherwise, a defendant could start the practice again once the suit is dismissed. Instead, voluntary cessation creates mootness only when it's "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). In short, for the case to be moot, the defendant must not be "free to return to [its] old ways." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 200 n.4 (1988)).

On one hand, the NCAA may appear free to return to its old ways. It hasn't signed a contract that would bar it from retracting its waiver, and the waiver isn't "unconditional and

irrevocable." *Id.* at 93. So the NCAA could theoretically rescind the waiver and block Pavia from playing during the 2025 season.

On the other hand, the NCAA's legal representations indicate that it won't revoke the waiver. It is standard practice to accept a party's representations to the court "as parameters for decision." *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974). And the NCAA has promised in its briefing and at oral argument that it will honor the waiver regardless of the outcome of this appeal. *See* Appellant's Suppl. Br. at 13. Pavia believes this representation. *See* Appellee's Suppl. Br. at 5 ("Mr. Pavia understands that the NCAA waiver will remain in place . . . regardless of this Court's ruling.").

In addition, practical realities might prevent the NCAA from rescinding the waiver. The waiver has been in place since December 23, 2024. *NCAA Division I Board of Directors Waiver Guidance for 2025-26 Eligibility Question and Answer Document*, NCAA (July 18, 2025), https://perma.cc/4QFS-NU2W. That means the athletes who received the waiver have been relying on the extra year of eligibility for their college decisions and transfer commitments for the 2025 season. And it's not just the athletes. Coaches, administrators, and teammates are relying on the players' presence. So too are the NIL organizations who make significant financial investments in the players, including any such organizations at Vanderbilt dealing with Pavia. And the season has already begun in earnest. Given the enormous effects of rescinding the waiver, the NCAA might not "reasonably be expected" to enforce its eligibility rules against Pavia and others in the middle of the football season. *Friends of the Earth*, 528 U.S. at 189 (quoting *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203).

Though the issue of voluntary cessation is thorny, we need not decide it. Neither party argued in briefing that we have jurisdiction because of voluntary cessation, so that argument is forfeited. *See Resurrection Sch.*, 35 F.4th at 530; *cf. Taylor v. KeyCorp*, 680 F.3d 609, 615 n.5 (6th Cir. 2012) (analyzing forfeiture of an argument for jurisdiction). Although the litigants discussed voluntary cessation at oral argument at our prompting, such discussion doesn't save the argument from forfeiture. *Resurrection Sch.*, 35 F.4th at 530. And even if the parties can't forfeit arguments *against* subject-matter jurisdiction, they can forfeit arguments *for* it. *See Taylor v. Pilot Corp.*, 955 F.3d 572, 582 (6th Cir. 2020) (Thapar, J., concurring) (collecting

cases).  Despite a request for supplemental briefing on the topic of mootness—a request that explicitly referenced the possibility of the NCAA revoking the waiver—neither the NCAA nor Pavia mentioned voluntary cessation.  Because both parties forfeited the argument, we don't discuss it further.  The appeal is moot.

### III.

Since the appeal is moot, we must decide whether to vacate the preliminary injunction. *See United States v. Munsingwear, Inc*., 340 U.S. 36, 39–41 (1950).  But *Munsingwear* does not demand vacatur here.  To merit vacatur, the NCAA bears the burden of showing that (1) the order would have a preclusive effect on later litigation and (2) the NCAA, as the burdened party, didn't cause the order's mootness.  *Mktg. Displays Int'l v. Shaw*, 93 F.4th 967, 971 (6th Cir. 2024).  Here, the NCAA caused mootness by issuing the waiver.  So we will not vacate the injunction.

\*     \*     \*

We dismiss the NCAA's appeal as moot.

_____

**CONCURRENCE**

_____

THAPAR, Circuit Judge, concurring. A three-point buzzer-beater, a fourth-quarter Hail Mary, a walk-off grand slam. College sports kickstart careers—but, more importantly, they inspire young people around the country to learn teamwork, practice self-discipline, and embrace a commitment to excellence.

Diego Pavia's remarkable career—from undersized recruit to junior-college champion to star SEC quarterback—models the American athletic dream. His impressive play deserves close attention. And so does his challenge to the NCAA's eligibility rules. Though mootness prevents us from hearing the merits of the NCAA's appeal, the appeal highlights open questions about the purposes and effects of the NCAA's rules. Since this controversy will continue to exist, those questions will have to be answered.

I.

The NCAA, like other athletic organizations, creates "agreement[s] among competitors on the way in which they will compete with one another." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984). On one hand, those agreements allow the NCAA to craft rules to promote uniform and fair gameplay—cooperation without which college sports would not exist in their current form. *Id.* at 101–02 (citing Robert Bork, *The Antitrust Paradox* 278 (1978)); *see also* Amicus Br. at 5. But on the other hand, formal agreements among competitors about employment and production look like the type of "restraint[s] of trade or commerce" that may violate the Sherman Act. 15 U.S.C. § 1.

These rules pose unique difficulties for judges. Courts have struggled to categorize the procompetitive and anticompetitive effects of NCAA rules over the past four decades. Most recently, the Supreme Court upheld restrictions on the NCAA's ability to limit education-related compensation for college athletes. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 84–85, 107 (2021). Although the Court has dealt with NCAA *compensation* rules, it has never analyzed NCAA *eligibility* rules, which determine who can play for college teams.

This case demonstrates the sheer volume of open questions that remain before a court can thoughtfully analyze such rules.

## II.

For starters, the parties disagree over whether Pavia sufficiently defined the relevant market for antitrust analysis of the JUCO Rule.  In antitrust cases, market definition often proves dispositive.  *See, e.g.*, *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club* (*NHLPA I*), 325 F.3d 712, 720 (6th Cir. 2003).  Market definition usually requires evidence of economic competition, substitute products or services, and consumers' response to price changes.  *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009).  And if a plaintiff doesn't meet his burden to define the relevant market, his claim might fail.  *NHLPA I*, 325 F.3d at 720.  Here, although Pavia and his expert pointed to two possible relevant markets—the labor markets for NCAA Division I college football and for college football in general—they didn't introduce substantial economic evidence defining the boundaries of those markets.

The district court reasoned that the market here doesn't require "precise" definition because the JUCO Rule operates as a "horizontal restraint on trade."  R. 41, Pg. ID 1408 n.8 (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018)).  And extensive evidence of market structure could be less imperative given the lack of dispute here about the NCAA's market power.  *See Am. Express Co.*, 585 U.S. at 543 & n.7.  But analysis of anticompetitive and procompetitive effects—the key to many antitrust cases—relies on market definition.  So no matter what level of precision is required, more specificity and evidence about the relevant markets would be helpful as the case progresses.

The parties should also address the appropriate antitrust framework for analyzing the JUCO Rule.  Eligibility rules like the JUCO Rule could resemble concerted refusals to deal, since the NCAA member schools are agreeing not to employ a class of athletes like Pavia.  Such agreements can be facially anticompetitive.  *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294–97 (1985).  And at the end of oral argument, Pavia's counsel suggested that the NCAA was, in effect, boycotting a class of athletes like Pavia.

But Pavia had never mentioned this possibility before—not in his complaint, his arguments for a preliminary injunction, or his appellate briefing. If Pavia intends to pursue this theory (and the NCAA intends to rebut it), there's work to be done on remand.

Additional evidence of the JUCO Rule's competitive effects would also aid judicial review. Weighing competitive effects is a vital part of antitrust analysis. *Alston*, 594 U.S. at 81. And the plaintiff's usual burden to show anticompetitive effects isn't "slight." *Id.* at 97. Indeed, plaintiffs fail to meet that burden in most antitrust suits, meaning a "voluminous record" is often critical. *Id.*

Of course, at this early point, the record is not "voluminous." The district court found that Pavia showed "some evidence" that the JUCO Rule harmed competition. R. 41, Pg. ID 1409. For instance, Pavia suggested that the rule gives NCAA schools an advantage over junior colleges in recruiting football players, since the players lose years of NCAA eligibility by choosing a junior college. Perhaps that's correct. But Pavia hasn't yet introduced any statistics or studies proving that players actually choose NCAA schools over junior colleges because of the JUCO Rule. Nor has he identified Division I labor-market effects stemming from the exclusion of JUCO players—even though those players, according to Pavia's expert, may comprise some ten percent of the available roster spots for top Division I schools. This type of evidence would greatly assist judicial review.

And the NCAA's claimed procompetitive effects have similar shortcomings so far. Its expert hypothesized that the JUCO Rule helps make NCAA college football a special athletic product. Yet he hasn't yet cited any evidence that consumers prefer the sport—and that the NCAA's revenue therefore holds steady or grows—because players' junior-college years count toward their limit of eligible seasons. Nor has the NCAA's expert squared the JUCO Rule's asserted necessity with the many other NCAA policies and eligibility exceptions that allow older, more experienced players to compete. Addressing these questions will also help the district court's antitrust analysis.

The absence of cold, hard data is especially glaring in a market that is rapidly changing. It's hard to perform "a careful analysis of market realities" when the parties haven't grappled

with recent changes. *Alston*, 594 U.S. at 93. Just this year, the NCAA reversed decades of anti-compensation rules by agreeing to allow member schools to pay players directly. *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 (CAW), 2025 WL 1675820, at *7 (N.D. Cal. June 6, 2025). This shift will undoubtedly have seismic effects on the college-football market.

So too will several other recent developments. Consider the market-altering effects of the NCAA's agreement to allow NIL collectives to recruit and negotiate with prospective athletes on behalf of schools. *See* Consent Judgment & Permanent Injunction, *Tennessee v. Nat'l Collegiate Athletic Ass'n*, No. 24-CV-00033 (E.D. Tenn. Mar. 21, 2025), Dkt. 92 (permanently enjoining the NIL recruiting ban). Or the NCAA's decision to allow players unlimited transfers between schools. Even the waiver giving Pavia and others another year of eligibility may have ripple effects impacting the merits of Pavia's case. So Pavia and the NCAA should provide the district court with the economic evidence it needs to conduct a "careful analysis" of these new "market realities." *Alston*, 594 U.S. at 93.

Many more questions remain. For one, why aren't junior colleges suing over the JUCO Rule? If Pavia is right that junior colleges can't compete with NCAA schools because of the rule, shouldn't they have reason to complain? The record gives no indication of any such complaints from junior colleges.

And what about Division II and Division III schools? The parties don't discuss these schools much, even though Division II schools directly competed with junior colleges to recruit Pavia. Does it matter that seasons played at these schools also count against a player's limit of four seasons? Or that these schools, unlike junior colleges, choose membership in the NCAA? Couldn't the NCAA's equal application of the JUCO Rule both internally to its own member schools and externally to non-member schools impact the competitive effects of the rule? Could eliminating the JUCO Rule give junior colleges a leg up over Division II or III schools? And would elimination require similar treatment of Division II or III seasons? Does the Sherman Act require such results? These questions are likely significant in guiding the district court's resolution of the remaining issues.

III.

The litigants' answers to these questions could have sweeping ramifications. The JUCO Rule is one of a host of NCAA eligibility rules governing who can play college sports. These rules include enrollment and degree requirements, as well as minimum-GPA thresholds. Many of these rules aren't controversial. *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) ("Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing."). But depending on how courts resolve challenges to the JUCO Rule, these other eligibility rules could also face antitrust review. *See* Amicus Br. at 12–14. Although Pavia's counsel suggested at oral argument that these rules would survive such scrutiny, that result isn't a foregone conclusion.

Even if courts uphold these rules, the mere fact of judicial review poses problems for college athletics. At present, players like Pavia are continuing to challenge these rules, creating a "seemingly endless wave of litigation." Appellant's Suppl. Br. at 4. Those lawsuits could have substantial and unforeseeable impacts on the world of college sports. Over time, courts could "become the *de facto* appeals body for eligibility determinations for over half a million student-athletes" in all divisions of NCAA sports. Amicus Br. at 19. Unlike football, most of these NCAA sports are "nowhere close to profitable." *Id.* at 8. But any decision about the eligibility rules for lucrative sports, like football and basketball, has downstream effects for those other sports, like water polo, lacrosse, and more.

And what would those decisions look like? Consider the line-drawing problems an analysis of eligibility rules might pose. Does a five-year limit on a college athlete's career violate the Sherman Act? If not, what about a four-year limit? Or if it does, what about a six-year limit? Is a 2.0 GPA requirement reasonable when a 2.5 GPA requirement might not be? Can colleges require twelve hours of academic credit per term? Most importantly, what are the economic impacts of each of these rules? Such questions make judges "mindful" of our "limitations." *Alston*, 594 U.S. at 106. We aren't good "central planners and should never aspire to the role." *Id.* at 103 (cleaned up). Perhaps Congress, the NCAA, and the players can instead work together to determine a way forward.

College sports deserve careful planning.  They provide a unique opportunity for young men and women to make lifelong friends, develop leadership skills, and learn self-discipline and self-confidence.  And, of course, college sports provide inspiration for young people around the country.  From Doug Flutie's legendary Hail Mary for Boston College to Lorenzo Charles's game-winning dunk for N.C. State in the 1983 men's basketball championship to Caitlin Clark's record-breaking career at Iowa, college athletes have etched themselves into millions of Americans' memories.  When courts decide who is qualified to participate in this great tradition, we implicate the line separating college athletics from professional athletics.  Our intervention could have unknown consequences on the intangible benefits from college sports.

Congress should consider stepping in to preserve these benefits for the millions of young athletes yet to come.  Until it does so, judges should tread carefully in this area and insist on a thorough record from which to rule.

—————————

## CONCURRENCE

—————————

HERMANDORFER, Circuit Judge, concurring.   All that is before us is a preliminary injunction covering the 2025-26 football season.  But a decision in this appeal has no prospect of altering anyone's rights in the 2025-26 football season.  So I agree that the NCAA's appeal is moot.

Dismissal not only respects Article III's limits.   Deferring a merits decision at this juncture is also preferable in practice.  *National Collegiate Athletic Ass'n v. Alston* makes clear that the NCAA may no longer sidestep antitrust scrutiny with an amateurism justification ill-suited for today's age of compensated college players.  *See* 594 U.S. 69, 94-95 (2021).  But it remains unclear just how to apply traditional antitrust principles to the NCAA's catalogue of evolving policies.  Post-*Alston*, dozens of courts have split on challenges to NCAA rules limiting player mobility, eligibility, and compensation.  *See* NCAA Suppl. Br. Addendum (collecting 34 cases).  Enabling the parties here to refine their theories and evidence through discovery and final judgment will provide additional information critical to fully assessing the JUCO Rule's soundness in antitrust.

Despite today's dismissal, these appellate proceedings helped clarify important legal and factual questions that remain open.  Judge Thapar notes several, ranging from the role of market definition to the analytical impact of the NCAA's latest rule changes.  *See* Thapar Concurring Op. at 11-13.  Most critically to my mind, the parties' arguments have shown the importance of distilling the distinct anticompetitive effects alleged: first, the effects on junior colleges' ability to compete with NCAA member schools for college football players, and second, the effects on NCAA Division I football players.  The district court considered both angles when finding anticompetitive harms in the markets for college football players generally and NCAA Division I football players particularly.  But on appeal, Pavia homed in on the JUCO Rule's effect on the market for NCAA Division I football players—and specifically, on the argument that Division I schools have unlawfully restrained labor competition in that market by together agreeing to limit the NCAA playing careers of former JUCO players.

That emphasis may be well founded. *Alston* accepts that antitrust rules apply to the labor side of the NCAA Division I football market. 594 U.S. at 86-87. And "colleges and universities essentially 'hire' both coaches and players." Roger D. Blair & Jeffrey L. Harrison, *Monopsony in Law and Economics* 10 (2010). Pavia's expert asserted that, in past years, around 10 percent of available roster spots in the most competitive Division I football programs go to former JUCO players. Whatever the number now, it is indisputable that the JUCO Rule annually (i) excludes a class of experienced former-JUCO players from playing at Division I schools based solely on their former JUCO affiliation and (ii) shifts the resulting roster spots to new or less-seasoned players. Indeed, the NCAA lists preventing the "crowding out of younger, less experienced athletes in Division I football" as among the JUCO Rule's express aims. NCAA Br. 42 n.7.

Pavia puts a face on this market foreclosure. Prior to the 2025-26 season, he was enrolled in good standing at Vanderbilt, had participated in only three seasons of NCAA competition, and was Vanderbilt's choice for QB1. Yet as things stood before this suit, the JUCO Rule would have barred Pavia from playing a fourth NCAA season simply because he used to compete for a JUCO. Pavia's exclusion would have cost him substantial compensation—estimated at over $1 million. Maj. Op. at 3. Vanderbilt's noted football turnaround stood to lose too. *See generally* Pat Forde, *The Serape, Street-Fighter QB and Swagger That Made Vanderbilt an SEC Contender*, Sports Illustrated (Sept. 18, 2025), https://perma.cc/Y5KJ-DUYY. Nor is Pavia's predicament some one-off harm to a lone competitor, since the JUCO Rule operates market wide. *See, e.g.*, *Elad v. Nat'l Collegiate Athletic Ass'n*, No. 25-cv-1981, 2025 WL 1202014, at *6 (D.N.J. Apr. 25, 2025) (potential lost compensation of up to $650,000); *Braham v. Nat'l Collegiate Athletic Ass'n*, --- F. Supp. 3d ----, 2025 WL 2017162, at *8 (D. Nev. July 18, 2025) (potential lost compensation "valued at $500,000").

Under prevailing theories of antitrust harm, NCAA member schools' market coordination through the JUCO Rule raises red flags. Employers' horizontal agreements not to negotiate with defined segments of the labor force can be problematic in other contexts. *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703-04 (7th Cir. 2023). That includes in professional-sports cases, where labor-side limitations akin to group boycotts or concerted refusals to deal

have not fared well under the Sherman Act.[1] Still now, many restraints on labor markets in professional sports operate only by virtue of exceptions to the antitrust laws, like the statutorily implied one covering collective bargaining, *see, e.g.*, *Brown v. Pro Football, Inc.*, 518 U.S. 231, 235 (1996); *Clarett v. Nat'l Football League*, 369 F.3d 124, 130 (2d Cir. 2004), or the judicially invented one covering baseball, *Flood v. Kuhn*, 407 U.S. 258, 282 (1972). No such exception applies to the NCAA at present.

Focusing on the market for Division I football labor helps highlight pertinent questions about the JUCO Rule's economics. From this lens, it seems less probative how the JUCO Rule affects the calculus of all graduating high-school football players considering where to start their intercollegiate careers. What arguably matters more is how foreclosing experienced former JUCO players from their would-be third and fourth years of NCAA competition affects the Division I football labor market. And in that market, the NCAA has not disputed that it enjoys "monopsony[] control" and is thus "capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor." *Alston*, 594 U.S. at 86; *see also* Blair & Harrison, *Monopsony in Law and Economics*, at 189.

The NCAA has suggested that the JUCO Rule does not depress wages. Citing "ordinary" economic principles, the NCAA asserts that an increased worker supply (here, of eligible players) normally decreases worker wages (here, player compensation directly by schools and through name, image, and likeness agreements). From there, the NCAA posits that permitting additional JUCO players into the Division I market may if anything lead to reduced player compensation. *Cf. Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 871 (7th Cir. 2025) (similar).

But there is reason to doubt that the market for Division I football labor fits that prevailing supply-wage rule. In standard economic theory, wages reflect workers' marginal

---

[1]*See, e.g.*, *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1176, 1185-87 (D.C. Cir. 1978) (player draft and no-tampering rule); *Mackey v. Nat'l Football League*, 543 F.2d 606, 623 (8th Cir. 1976) (Rozelle Rule); *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 408 (S.D.N.Y. 2004) (draft-eligibility rule), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1318, 1320-23 (D. Conn. 1977) (draft-eligibility rule); *Kapp v. Nat'l Football League*, 390 F. Supp. 73, 82 (N.D. Cal. 1974) (Rozelle Rule, player draft, and no-tampering rule); *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1058, 1066-67 (C.D. Cal. 1971) (draft-eligibility rule).

productivity—the value of their output. Ioana Marinescu & Herbert Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L.J. 1031, 1038 (2019). But football prowess and productivity are not distributed uniformly across players. Skill is highly differentiated, meaning "[l]esser talent often is a poor substitute for greater talent." Sherwin Rosen, *Economics of Superstars*, 71 Am. Econ. Rev. 845, 846 (1981). Top athletic performers can thus drive far greater output by their organizations than less-skilled replacement players. *See, e.g.*, Stephen A. Bergman & Trevon D. Logan, *Revenue per Quality of College Football Recruit*, 21 J. Sports Econ. 571, 589-90 (2020). As a result, higher-skilled players may likewise command higher compensation and generate increased wage competition. *Cf., e.g.*, *Mackey*, 543 F.2d at 620-21; Areeda & Hovenkamp, *Antitrust Law*, ¶ 1505c3(D) n.124. If the JUCO Rule disproportionately excludes such high-earning-capacity players, it might drive down, not increase, Division I football compensation and product appeal. *See Fourqurean*, 143 F.4th at 874-75 (Ripple, J., dissenting). And as the NCAA agreed at oral argument, such effects on price and output could prove cognizable antitrust harm.

None of that is to leave the NCAA defenseless, no matter what level of antitrust scrutiny the JUCO Rule warrants. It is well settled that sports leagues need—and the Sherman Act tolerates—certain "horizontal restraints on competition" if "the product is to be available at all." *Alston*, 594 U.S. at 91 (citation omitted). Citing that leeway, Pavia's counsel maintains that antitrust challenges to other NCAA limits—like minimum-GPA and credit-hour requirements, or the five-year eligibility window—would fail. But as I currently understand things, that's not because the NCAA can immunize any trade restraint from review by deeming it "eligibility" related. Otherwise, the price-fixing in *Alston* could pass unscrutinized if recast as a rule rendering ineligible any player receiving excessive benefits. Any regulatory leeway instead reflects that certain NCAA rules policing what it means to be a bona fide *student* athlete seem bound to pass antitrust muster.

Whether the JUCO Rule survives Sherman Act scrutiny remains to be seen. The NCAA principally defends the JUCO Rule as needed to maintain a "high, sub-professional level of play." NCAA Br. 42. Under *Alston*, the NCAA need not "employ the least restrictive means of achieving [its] legitimate business objectives." 594 U.S. at 106. But neither can the NCAA

prevail on its word or policy aims alone. If Pavia can sufficiently show that the JUCO Rule works anticompetitive effects within the Division I football labor market, the NCAA must respond on antitrust terms with economic evidence. *Id.* at 96-97, 99. In so doing, the NCAA should consider how changed "market realities" may affect its proffered justifications for the JUCO Rule. *Id.* at 93. Such realities now include direct payment from schools to student athletes, a bar on transfer restrictions, and seemingly prevalent participation by older, non-JUCO players on Division I football teams through pathways like prep years, waivers, and redshirting. *See* Thapar Concurring Op. at 13; *Fourqurean*, 143 F.4th at 864.

Running parallel with the NCAA's current legal conflicts are contested public-policy debates about where antitrust scrutiny has led college sports. Many who have played, coached, managed, or followed collegiate athletics bring deeply held views about how to best address the myriad "policy and practical questions" athletic regulation implicates. *Alston*, 594 U.S. at 111 (Kavanaugh, J., concurring). Concerns range from counteracting player exploitation, to protecting non-revenue-producing programs and women's competitive opportunities, to promoting scholastic success, and more. *See id.*; Exec. Order No. 14322, 90 Fed. Reg. 35821 (July 24, 2025). Even now, federal lawmakers are considering options for a legislative path forward. *See, e.g.*, SCORE Act, H.R. 4312, 119th Cong. (2025).

There is no telling how or when the broader policy debate over the NCAA will play out. So at least for now, courts must follow *Alston* by endeavoring to address the NCAA's rules through the "lens of antitrust law" rather than their broader sense of "social good." 594 U.S. at 95, 107 (citation omitted). That might be a difficult task given the law's unsettled state in this arena. To best position this case going forward, the parties should further develop their arguments on remand to help ensure that any merits assessment abides by *Alston*'s antitrust framework.